**BROWNSBURG AREA PATRONS AFFECTING CHANGE and John Patten, Plaintiffs–Appellants,**

v.

**Patricia BALDWIN, Prosecuting Attorney for Hendricks County, Indiana, et al., Defendants–Appellees.**

No. 94S00–9803–CQ–144.

Supreme Court of Indiana.

June 23, 1999.

---

James Bopp, Jr., John K. Abegg, Terre Haute, Indiana, Attorneys for Appellants.

Jeffrey A. Modisett, Attorney General of Indiana, Jon Laramore Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellees.

SHEPARD, Chief Justice.

Brownsburg Area Patrons Affecting Change (BAPAC), and its founder John Patten sought a preliminary injunction from the United States District Court for the Southern District of Indiana. The court denied the request, and BAPAC filed an interlocutory appeal for the Seventh Circuit.

Before resolving BAPAC's claims, the Seventh Circuit certified a question of state law for this Court's consideration, pursuant to Seventh Circuit Rule 52 and Indiana Appellate Rule 15(O). The question reads:

> Does the Indiana Code's definition of a "political action committee," i.e., any organization which "accepts contributions or makes expenditures ... to influence the election of a candidate ... or the outcome of a public question ... that in aggregate exceed one hundred dollars ($100)," include

only those organizations which make contributions or expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for office or the victory or defeat of a public question?

*Brownsburg Area Patrons Affecting Change v. Baldwin,* 137 F.3d 503, 510 (7th Cir.1998). We answer this question in the affirmative.

### Background[1]

BAPAC is a small, voluntary, non-partisan association of citizens in Hendricks County, Indiana, founded by John Patten. The organization has no membership requirements, nor any officers or directors. BAPAC's mission is "to educate the citizens of Brownsburg and its environs on political, economic, and social issues and to serve as an organ for members of the community to advise public officials of citizens' views on issues." (Appellant's Br. at 4.) To accomplish its goals, BAPAC disseminates information on a telephone hotline recording and distributes flyers. *BAPAC,* 137 F.3d at 504. The telephone recordings state candidates' positions on issues and sometimes indicate whether these views accord with those of BAPAC. *Id.*

On June 6, 1996, following a primary election in May, William Daily, chairman of the Hendricks County Election Board, sent Patten a letter suggesting that BAPAC might be subject to the rules governing political action committees, including some registration and reporting requirements. *Id.;* (App. to Appellant's Br. at 27–28). Two months later, BAPAC responded to the Board's inquiry with a letter explaining that it could not be considered a political action committee "because BAPAC's major purpose is not to expressly advocate the election or defeat of any candidate." (App. to Appellant's Br. at 31.)

On August 28th, Daily sent BAPAC another letter explaining that while the Board had not reached a final decision about whether BAPAC was a political action committee un-

der Indiana law, it appeared as though their activities fell under the statute. (App. to Appellant's Br. at 33.) According to Daily, the statute covers organizations that spend more than $100 to influence the outcome of an election, and BAPAC's hotline message appeared to be an attempt to influence an election. (*Id.*) As such, Daily asserted that if BAPAC spent over $100 on the hotline message, it would be required to follow the rules for political action committees.

BAPAC did not respond to the second letter from Daily. Instead, in September 1996, it filed a complaint in District Court and moved for a preliminary injunction against the Attorney General of Indiana, four members of the Indiana Election Commission, the Hendricks County Prosecuting Attorney, and three members of the Hendricks County Election Board. The complaint alleged that the Indiana Code's definition of "political action committee" is unconstitutionally overbroad because it impermissibly regulates "issue advocacy" in violation of *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). *BAPAC,* 137 F.3d at 505. Issue advocacy involves discussion of issues as opposed to express advocacy for or against certain candidates or electoral outcomes. *Id.* BAPAC also challenged the statute on the ground that it regulates groups which do not have the "major purpose" of engaging in express advocacy, a limitation it maintains is also required by *Buckley. Id.* BAPAC sought the injunction to prohibit enforcement of the allegedly unconstitutional election provisions.

The District Court denied the motion, concluding that BAPAC did not demonstrate a likelihood of success on the merits. *BAPAC,* 943 F.Supp. at 993. More specifically, the court found that Indiana's statute did not regulate issue advocacy, based on the *Buckley* Court's interpretation of similar language contained within the Federal Election Campaign Act of 1971. *Id.* at 986–89. Because the court concluded that BAPAC engaged only in issue advocacy,[2] it held that BAPAC

---

1. The factual background and procedural history are set forth in the opinions of both the District Court and Court of Appeals. *See Brownsburg Area Patrons Affecting Change v. Baldwin,* 943 F.Supp. 975, 977–78 (S.D.Ind.1996); *BAPAC,*

137 F.3d at 504–05. We repeat some of the background here to provide context for our discussion of the certified question.

2. "The record here shows that plaintiffs BAPAC and Patten have not engaged in express advocacy

was not a PAC under Indiana law. Thus, the statute did not apply to BAPAC, and a preliminary injunction was unnecessary. *Id.* at 989.[3]

On appeal, BAPAC contended that the District Court erred in holding that the Indiana definition of a PAC applied only to express advocacy groups. *BAPAC,* 137 F.3d at 505. Rather than speculate about how we would interpret a state statute, and given that our answer would be outcome determinative, *see id.* at 509, the Court of Appeals certified a question to us.

As the Seventh Circuit points out, this case possesses an odd procedural posture. *Id.* at 505. BAPAC brought the case to escape the application of Ind.Code § 3–5–2–37. The District Court held that the statute did not apply to organizations that engaged only in issue advocacy. Because BAPAC, by its own contentions, engaged only in issue advocacy, it successfully avoided the statute. Undeterred by winning, BAPAC pushes on.

### Analysis

Indiana Code § 3–5–2–37(a), provides in pertinent part:

> "[P]olitical action committee" means an organization located within or outside Indiana that satisfies all of the following:
>
> (1) The organization is not:
>
> (A) affiliated with a political party; or
>
> (B) a candidate's committee.
>
> (2) The organization proposes *to influence:*
>
> (A) the election of a candidate for state, legislative, local, or school board office; or

(B) the outcome of a public question.

(3) The organization accepts contributions or makes expenditures during a calendar year *to influence* the election of a candidate for state, legislative, local, or school board office or the outcome of a public question that will appear on the ballot in Indiana that in the aggregate exceed one hundred dollars ($100).

(emphasis added).[4] BAPAC maintains that the District Court's narrow construction of "influence" as covering only express advocacy was untenable, and that a proper construction of the language would cover BAPAC's activities. BAPAC argues that the legislature's decision to regulate groups that seek "to influence" elections impermissibly regulates issue advocacy in violation of *Buckley.* We disagree.

### I. *Buckley*'s Express Advocacy Test

In *Buckley,* the Supreme Court addressed constitutional challenges to the Federal Election Campaign Act of 1971 (FECA) similar to those we face here. The Court noted that the Act touched an area of paramount importance:

> Discussion of public issues and debate on the qualifications of candidates are integral to the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order to "assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people."

*Buckley,* 424 U.S. at 14, 96 S.Ct. 612 (quoting *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957)). On the

---

and that they do not wish or intend to do so." *BAPAC,* 943 F.Supp. at 992. BAPAC continues to maintain that it intends only to engage in issue advocacy. (*See* Appellant's Br. at 4–5.)

**3.** The court also found that because BAPAC engaged only in issue advocacy, it lacked standing to challenge the statute for failing to incorporate the "major purpose" language mentioned in *Buckley. BAPAC,* 943 F.Supp. at 990–93. The certified question does not require us to address any claims involving the major purpose language.

**4.** Since this controversy first arose in 1996, Ind. Code § 3–5–2–37 has been amended twice. By

design, the 1998 amendment concerned technical corrections only and did not affect the substance of the law. *See* Pub.L. No. 2–1998, sec. 2, 1998 Ind. Acts 535–36 (codified as amended at Ind.Code § 3–5–2–37 (1998)); Pub.L. No. 2–1998, sec. 92, 1998 Ind. Acts 618 (uncodified). While the 1997 amendment did change some of the statute's language, *see* Pub.L. No. 3–1997, sec. 13, 1997 Ind. Acts 659–60 (codified as amended at Ind.Code § 3–5–2–37 (1997)), it did not change the language at issue in this case, nor does it require us to alter our consideration of the certified question. We therefore refer to the current statute throughout this opinion.

other hand, "[t]he constitutional power of Congress to regulate federal elections is well-established...." *Buckley*, 424 U.S. at 13, 96 S.Ct. 612. Thus, "the critical constitutional questions presented here go not to the basic power ... to legislate in this area, but to whether the specific legislation ... enacted interferes with First Amendment freedoms...." *Id.* at 13–14, 96 S.Ct. 612.

■ Assessing these competing interests, the Court divided political speech into two parts. "Express advocacy" is that speech which "in express terms advocate[s] the election or defeat of a clearly identified candidate...." *Id.* at 44, 96 S.Ct. 612.[5] Speech that does not expressly advocate the election or defeat of a clearly identified candidate, but does involve political ideas or social commentary, is now generally called "issue advocacy." *See, e.g.*, *BAPAC*, 943 F.Supp. at 977. As phrased by the District Court: "[T]he government may impose certain organizational and reporting requirements and expenditure and contribution limits on express advocacy, but any power to regulate the broader category of issue advocacy is far more limited." *BAPAC*, 943 F.Supp. at 977.[6]

The question before us is whether the "influence" language in the Indiana statute violates *Buckley's* express advocacy test.

## II. Dueling Canons of Construction

■ Both sides point to canons of construction they maintain control the outcome of this question. As we have noted, "[t]he rules or maxims of construction are flexible aids to the search for meaning." *A Woman's Choice—East Side Women's Clinic v. Newman*, 671 N.E.2d 104, 107 (Ind.1996) (plurality opinion).

### A. Clear on Its Face?

■ If a statute is unambiguous, then "courts must apply the plain language ... despite perhaps strong policy or constitutional reasons to construe the statute in some other way." *BAPAC*, 943 F.Supp. at 986 (citing *Indiana Dep't. of State Revenue v. Horizon Bancorp*, 644 N.E.2d 870, 872 (Ind. 1994)); *Grody v. State*, 257 Ind. 651, 659, 278 N.E.2d 280, 285 (1972). Moreover, when a statute is unambiguous, a court must apply the plain and obvious meaning and not resort to other rules of construction. *Eason v. Grissom*, 587 N.E.2d 114, 116 (Ind.1992). A statute is ambiguous when "it is susceptible to more than one interpretation." *In re Lehman*, 690 N.E.2d 696, 702 (Ind.1997).

■ BAPAC argues that our statute is not ambiguous, and that "influence" plainly and

---

5. In a footnote, the Supreme Court illustrated types of speech that would constitute express advocacy:

> This construction would restrict the application of [administrative regulations] to communications containing the express words of advocacy of election or defeat, *such as* "vote for," "elect," "support," "cast your ballot for," "Smith for Congress," "vote against," "defeat," "reject."

*Buckley*, 424 U.S. at 44 n. 52, 96 S.Ct. 612 (emphasis added). The Court's use of "such as" suggests that it did not intend for this to be an exhaustive list. A group could engage in express advocacy even if it did not use any of these buzzwords. As one court observed:

> "[E]xpress advocacy" is not strictly limited to communications using certain key phrases. The short list of words included in the Supreme Court's opinion in *Buckley* does not exhaust the capacity of the English language to expressly advocate the election or defeat of a candidate. A test requiring the magic words "elect," "support," etc., or their nearly perfect synonyms for a finding of express advocacy would preserve the First Amendment right of unfettered expression only at the expense of

eviscerating the Federal Election Campaign Act. "Independent" campaign spenders working on behalf of candidates could remain just beyond the reach of the Act by avoiding certain key words while conveying a message that is unmistakably directed to the election or defeat of a named candidate.

*Federal Election Comm'n v. Furgatch*, 807 F.2d 857, 862–63 (9th Cir.1987).

6. The express advocacy test of *Buckley* continues to be applied, with courts sometimes striking down statutes and other times upholding them. *Compare McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (striking down an Ohio statute prohibiting anonymous issue advocacy because it unconstitutionally regulated free speech), *and North Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705 (4th Cir.1999) (striking down a North Carolina statute regulating groups whose "incidental" purpose was to influence elections because it unconstitutionally regulated issue advocacy), *with Virginia Soc. for Human Life, Inc. v. Caldwell*, 152 F.3d 268 (4th Cir.1998) (upholding state statute after Virginia Supreme Court narrowly construed "influence" language in response to certified question).

obviously covers more than express advocacy. To support its argument, BAPAC points to the definition of "influence" in Black's Law Dictionary 779 (6th ed. 1990): "To affect, modify or act upon by physical, mental or moral power, especially in some gentle, subtle, and gradual way." As the District Court said, "[I]ssue advocacy, such as publicizing, praising, or criticizing candidates' views on particular issues, is often intended to influence an election, at least in some subtle way...." *BAPAC*, 943 F.Supp. at 985–86. We admit that, at first blush, "influence" does appear to touch issue advocacy. In the words of the District Court, "if this case had come to this court on a clean slate, [BAPAC's] arguments might have had considerable force.... In this case, however, the slate is far from clean." *Id.* at 986.

### B. Does Federal Language Import Federal Construction?

■ The Attorney General urges the statutory principle that when a legislature adopts language from another jurisdiction, it presumably also adopts the judicial interpretation of that language. (Appellee's Br. at 8–9.)[7]

■ Both sides acknowledge that the statute should be considered in light of FECA and *Buckley*. (*See* Appellant's Br. at 9, Appellee's Br. at 8.) First, the language of the Indiana statute virtually mirrors that of FECA. What the Indiana Code calls a "political action committee," FECA terms a "political committee." Ind.Code Ann. § 3–5–2–

37(a) (West Supp.1998); Federal Election Campaign Act of 1971, 2 U.S.C.A. § 431 (West 1997). Both are defined as a group of persons that receives "contributions" or makes "expenditures" in excess of a set dollar amount in a calendar year. Ind.Code Ann. § 3–5–2–37(a) (West Supp.1998) ($100); 2 U.S.C.A. § 431 ($1000). The definitions of "contributions" and "expenditures" focus on the use of money or other objects of value to "influence" the nomination or election of candidates. Ind.Code § 3–5–2–37(a); 2 U.S.C.A. § 431.

Second, the Indiana statute was introduced in the legislature shortly after the passage of FECA, and the General Assembly passed it shortly after *Buckley* was handed down. *BAPAC*, 943 F.Supp. at 987. We think the District Court was correct that the parallels between FECA and the Indiana statute are "strong and obvious." *Id.* According to the District Court, "[T]hese factors make this a strong case for presuming that the Indiana legislature intended to adopt the federal construction in *Buckley v. Valeo*." *Id.* at 988.[8]

### C. Clues of Intent in Other Statutes

BAPAC counters with its own indicators of legislative intent. It argues that even as to ambiguous statutes, we must "give effect to the intent of the legislature." *Lehman*, 690 N.E.2d at 702. As noted above, the General Assembly substantively amended Indiana Code § 3–5–2–37 in 1997,[9] but did not change the "influence" language. At the same time,

---

**7.** This principle is well-established in both federal and state law. *See Carolene Prods. Co. v. United States*, 323 U.S. 18, 26, 65 S.Ct. 1, 89 L.Ed. 15 (1944) (cited in *BAPAC II*, 137 F.3d at 507); *A Woman's Choice*, 671 N.E.2d at 110 n. 11; *Pittsburgh, Cincinnati, Chicago & St. Louis R.R. v. Parker*, 191 Ind. 686, 132 N.E. 372, 375 (1921); *Moses v. Cober*, 641 N.E.2d 668, 670 (Ind.Ct.App.1994); *Habig v. Bruning*, 613 N.E.2d 61, 64 (Ind.Ct.App.1993); *In Re Marriage of Hudson*, 434 N.E.2d 107, 113 (Ind.Ct.App.1982), *cert. denied*, 459 U.S. 1202, 103 S.Ct. 1187, 75 L.Ed.2d 433 (1983).

**8.** In response to this argument, BAPAC points out that the Supreme Court criticized the "influence" language of FECA as highly problematic. According to BAPAC:

It is unlikely that upon reading *Buckley*, [the General Assembly] commented:

"The Supreme Court of the United States has held that the phrase 'for the purpose of influencing an election' poses significant problems of vagueness and overbreadth. Let's use this language in our law, as opposed to using language that we know will not be unconstitutional!"

(Appellant's Br. at 19.) We think it just as likely the General Assembly could have concluded after *Buckley*: "The Supreme Court of the United States didn't seem to like the 'influence' language, but at least we know how they'll interpret it. Let's use this language in our law, as opposed to language we don't know how they'll interpret!"

**9.** Pub.L. No. 3–1997, sec. 13, 1997 Ind. Acts 659–60.

the legislature added a section to the Code in which it included express advocacy language.[10] According to BAPAC, the addition of the express advocacy language in § 3–9–3–2.5 illustrates the legislature was aware of the difference between "influence" and "expressly advocate." BAPAC argues:

> [I]ts decision not to include this test in Ind.Code § 3–9–2–37(a) *when it was amending the statute—while at the same time adding* this test to Ind.Code § 3–9–3–2.5—shows that the General Assembly did not intend for Indiana's definition of PAC to be restricted to express advocacy groups.... If it had meant to define PAC as an organization that expended funds for express advocacy only, it would have said so explicitly, just as it did in Ind.Code § 3–9–3–2.5, rather than use the term "influence."

(Appellant's Br. at 16.)

■ This argument's flaw is that it asks us to assume the legislature intended that "influence" in Ind.Code § 3–5–2–37 mean something broader than express advocacy, and did so after *Buckley* was handed down. This requires us to assume an unconstitutional intent. As a general rule, "Unconstitutional intention will not be attributed to the legislature if reasonably avoidable." *Price v. State,* 622 N.E.2d 954, 963 (Ind.1993) (citing *Conter v. Commercial Bank of Crown Point,* 209 Ind. 510, 513–14, 199 N.E. 567, 569 (1936)). This brings us to the canon that seems weightiest for today's purposes.

### D. Saving Construction

■ We have regularly said that courts have an "overriding obligation to construe our statutes in such a way as to render them constitutional if reasonably possible...." *A Woman's Choice,* 671 N.E.2d at 111 (Dickson, J., concurring). "[A] statute is

accorded every reasonable presumption supporting its validity." *Burris v. State,* 642 N.E.2d 961, 968 (Ind.1994), *cert. denied,* 516 U.S. 922, 116 S.Ct. 319, 133 L.Ed.2d 221 (1995) (citing *Brady v. State,* 575 N.E.2d 981 (Ind.1991)). "If a statute can be construed to support its constitutionality, such construction must be adopted." *Burris,* 642 N.E.2d at 968 (citing *Miller v. State,* 517 N.E.2d 64 (Ind.1987)). The question thus becomes whether Ind.Code § 3–5–2–37 is amenable to a reasonable constitutional construction.

BAPAC urges us to find that "influence" may not reasonably be read to encompass only express advocacy. (*See* Appellant's Br. at 13.) If so, however, the Supreme Court was wrong when it construed that term in *Buckley.* As the State points out, "*Buckley* constitutes the U.S. Supreme Court's authoritative construction of federal statutory language." (Appellee's Br. at 10.) Although this case involves the interpretation of state law, the approach of the *Buckley* Court seems a suitable way of addressing whether the language in our statute may reasonably bear a narrowing construction.

In *Buckley,* the Supreme Court noted that the "influence" language of FECA, on its face, had "potential for encompassing both issue discussion and advocacy of a political result," and "could be interpreted to reach groups engaged purely in issue discussion." 424 U.S. at 79, 96 S.Ct. 612. The Court then acknowledged that, as lower courts had demonstrated,[11] the purpose of the Act could be fulfilled and constitutional problems avoided by construing the language more narrowly. *Id.* The Court stated:

> To insure that the reach of [the statute] is not impermissibly broad, we construe "expenditure" for purposes of that section ... to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate.

10. Ind.Code § 3–9–3–2.5, Pub.L. No. 3–1997, sec. 183, 1997 Ind. Acts 740–41. As BAPAC points out, (Appellant's Br. at 15 n. 11), the General Assembly likely enacted § 3–9–3–2.5 in response to *Stewart v. Taylor,* 953 F.Supp. 1047 (S.D.Ind.1997). *Stewart* held that Indiana's disclaimer statute for campaign literature, Ind.Code § 3–9–3–2 (repealed in 1997), was overbroad for encroaching upon legitimate political expression. *See Stewart,* 953 F.Supp. at 1054–55 (holding

that statute was not narrowly tailored to prohibit misleading and fraudulent information).

11. The Court cited *United States v. National Comm. for Impeachment,* 469 F.2d 1135, 1139–42 (2d Cir.1972); *American Civil Liberties Union v. Jennings,* 366 F.Supp. 1041, 1055–57 (D.D.C. 1973), *vacated as moot sub nom, Staats v. American Civil Liberties Union,* 422 U.S. 1030, 95 S.Ct. 2646, 45 L.Ed.2d 686 (1975).

*Id.* at 80, 96 S.Ct. 612 (footnote omitted). Examining language virtually identical to that contained in the Indiana statute, the Supreme Court concluded that the statute should be narrowly construed. "[T]he Supreme Court of the United States has not only held that the material language at issue ... can bear the constitutional interpretation but has given that language the definitive interpretation as a matter of federal law." *BAPAC*, 943 F.Supp. at 989. We believe that Ind.Code § 3-5-2-37, like FECA, can reasonably bear a narrowing construction.

### Conclusion

We hold that the definition of "political action committee" in Ind.Code § 3-5-2-37 should be narrowly construed to encompass "only those organizations which make contributions or expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for office or the victory or defeat of a public question." *BAPAC*, 137 F.3d at 510.[12] Such a ruling accommodates a permissible level of election regulation while protecting important First Amendment activities. "This is consistent with the firmly established principle that the right to speak out at election time is one of the most zealously protected under the Constitution." *Central Long Island Tax Reform*, 616 F.2d at 53 (citing *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 271-72, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971)). Accordingly, we answer the certified question in the affirmative.

DICKSON, SULLIVAN, SELBY, and BOEHM, JJ.,concur.

---

12. Our holding is not meant to indicate whether we believe BAPAC's activities fall within the statute's reach. Both parties agree that BAPAC engages only in issue advocacy, and the certified question does not encompass this issue. We believe, however, the legislature did not intend for every potentially "influential" organization to qualify as a PAC, and thus be subjected to reporting and registration requirements. For example, the legislature surely did not intend for the average bass fishing club that holds open meetings to register as a PAC, or a neighborhood crime watch group, or the Elks club that builds a float for the annual Fourth of July parade. These groups all have the potential to influence elections "in some gentle, subtle, and gradual way," Black's Law Dictionary 779 (6th ed.), but so long as they do not expressly "advocate the election or defeat of a clearly identified candidate," *Buckley*, 424 U.S. at 44, 96 S.Ct. 612, or expressly advocate for or against a public question, they are not required to register as PACs.