In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3770

Jimmy Gresham, on his own behalf
and on behalf of a class of those
similarly situated,

Plaintiff-Appellant,

v.

Bart Peterson, in his official capacity as
Mayor of the City of Indianapolis, Indiana,
and the City of Indianapolis, Indiana,

Defendants-Appellees.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 99 C 1101--S. Hugh Dillin, Judge.

Argued March 30, 2000--Decided August 31, 2000

Before Harlington Wood, Jr., Easterbrook and Kanne,
Circuit Judges.

Kanne, Circuit Judge. Jimmy Gresham challenges an
Indianapolis ordinance that limits street begging
in public places and prohibits entirely
activities defined as "aggressive panhandling."
Gresham believes that the ordinance infringes his
First Amendment right to free speech and his
Fourteenth Amendment right to due process. The
city considers the ordinance a reasonable
response to the public safety threat posed by
panhandlers. The district court found that a
state court could construe the ordinance in such
a way to render it sufficiently clear and
specific and granted the city summary judgment on
Gresham's request for a permanent injunction. We
affirm.

I.  History

     The parties have stipulated to the relevant
facts, which for the purposes of reviewing a
summary judgment motion, we accept as true. See
Cable v. Ivy Tech State College, 200 F.3d 467,
476 (7th Cir. 1999). In June 1999, the City of
Indianapolis amended an ordinance regarding
solicitation in public places. The ordinance,

which became effective on July 6, 1999, reads as
follows:

(a)  As used in this section, panhandling means
any solicitation made in person upon any street,
public place or park in the city, in which a
person requests an immediate donation of money or
other gratuity from another person, and includes
but is not limited to seeking donations:

(1)  By vocal appeal or for music, singing, or
other street performance; and,

(2)  Where the person being solicited receives an
item of little or no monetary value in exchange
for a donation, under circumstances where a
reasonable person would understand that the
transaction is in substance a donation.
However, panhandling shall not include the act of
passively standing or sitting nor performing
music, singing or other street performance with
a sign or other indication that a donation is
being sought, without any vocal request other
than in response to an inquiry by another person.

(b)  It shall be unlawful to engage in an act of
panhandling on any day after sunset, or before
sunrise.

(c)  It shall be unlawful to engage in an act of
panhandling when either the panhandler or the
person being solicited is located at any of the
following locations; at a bus stop; in any public
transportation vehicle or public transportation
facility; in a vehicle which is parked or stopped
on a public street or alley; in a sidewalk cafe;
or within twenty (20) feet in any direction from
an automatic teller machine or entrance to a
bank.

(d)  It shall be unlawful to engage in an act of
panhandling in an aggressive manner, including
any of the following actions:

(1)  Touching the solicited person without the
solicited person's consent.

(2)  Panhandling a person while such person is
standing in line and waiting to be admitted to a
commercial establishment;

(3)  Blocking the path of a person being
solicited, or the entrance to any building or
vehicle;

(4)  Following behind, ahead or alongside a
person who walks away from the panhandler after
being solicited;

(5)  Using profane or abusive language, either

during the solicitation or following a refusal to make a donation, or making any statement, gesture, or other communication which would cause a reasonable person to be fearful or feel compelled; or,

(6) Panhandling in a group of two (2) or more persons.

(e) Each act of panhandling prohibited by this section shall constitute a public nuisance and a separate violation of this Code. Each violation shall be punishable as provided in section 103-3 of the Code, and the court shall enjoin any such violator from committing further violations of this section.

City-County General Ordinance No. 78 (1999), Revised Code of Indianapolis and Marion County sec. 407-102. Section 103-3 provides that a person convicted of violating the ordinance will be fined not more than $2,500 for each violation. The ordinance does not provide for imprisonment of violators, except, of course, a past offender who violates the mandatory injunction provided in Paragraph (e) could be jailed for contempt.

Jimmy Gresham is a homeless person who lives in Indianapolis on Social Security disability benefits of $417 per month. He supplements this income by begging, using the money to buy food. He begs during both the daytime and nighttime in downtown Indianapolis. Because different people visit downtown at night than during the day, it is important to him that he be able to beg at night. Gresham approaches people on the street, tells them he is homeless and asks for money to buy food. Gresham has not been cited for panhandling under the new ordinance, but he fears being cited for panhandling at night or if an officer interprets his requests for money to be "aggressive" as defined by the law.

Gresham filed this class action shortly after the ordinance took effect, requesting injunctive and declaratory relief. Gresham moved for a preliminary injunction barring enforcement of the ordinance on the grounds that it was unconstitutionally vague and violated his right to free speech. The district court, after hearing oral argument, notified the parties that it would convert its order on the preliminary injunction into an order on the merits. The parties filed additional memoranda of law, but no additional evidence. On September 28, 1999, the court entered a final order denying the motion for preliminary injunction and dismissing the case.

In the order, the district court construed the list of six actions that constitute aggressive panhandling as exclusive, eliminating the danger

that someone could be cited for other, unenumerated acts. The court further ruled that the proscription in Paragraph (d)(5) against actions that make a person "fearful or feel compelled" was not unconstitutionally vague because it could be interpreted to mean "fear for his safety or feel compelled to donate." The court held that because the ordinance was civil in nature and the actions prohibited under aggressive panhandling were not related to speech interests, no intent element was necessary. Finally, the court found the ordinance to be a valid content-neutral regulation under Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37 (1983).

## II.  Analysis

On appeal, Gresham raises two principal arguments. First, he contends that the provisions defining aggressive panhandling are vague because they fail to provide clear criteria to alert panhandlers and authorities of what constitutes a violation and because they fail to include an intent element. Second, he argues that the statute fails the test for content-neutral time, place and manner restrictions on protected speech. We review de novo the question of whether a state law violates the Constitution. See Scariano v. Justices of Supreme Court of Ind., 38 F.3d 920, 924 (7th Cir. 1994).

## A.  The First Amendment

Laws targeting street begging have been around for many years, but in the last twenty years, local communities have breathed new life into old laws or passed new ones. Cities, such as Indianapolis, have tried to narrowly draw the ordinances to target the most bothersome types of street solicitations and give police another tool in the effort to make public areas, particularly downtown areas, safe and inviting.

While the plaintiff here has focused the inquiry on the effects of the ordinance on the poor and homeless, the ordinance itself is not so limited. It applies with equal force to anyone who would solicit a charitable contribution, whether for a recognized charity, a religious group, a political candidate or organization, or for an individual. It would punish street people as well as Salvation Army bell ringers outside stores at Christmas, so long as the appeal involved a vocal request for an immediate donation.

The ordinance bans panhandling by beggars or charities citywide on any "street, public place or park" in three circumstances. First, it would

prohibit any nighttime panhandling. sec. 407-102(b). Second, it would prohibit at all times-- day or night--panhandling in specified areas. sec. 407-102(c). Third, it would prohibit "aggressive panhandling" at all times. sec. 407-102(d)(1)-(6). The defendants emphatically point out that the ordinance allows a great deal of solicitation, including "passive" panhandling, which does not include a vocal appeal, street performances, legitimate sales transactions and requests for donations over the telephone or any other means that is not "in person" or does not involve an "immediate donation." Under the ordinance, one could lawfully hold up a sign that says "give me money" and sing "I am cold and starving," so long as one does not voice words to the effect of "give me money."

Several courts before us, as well as many commentators, have grappled with understanding panhandling laws in light of the First Amendment guarantee of free speech and the constitutional right to due process. See, e.g., Smith v. City of Fort Lauderdale, 177 F.3d 954 (11th Cir. 1999); Loper v. New York City Police Dep't, 999 F.2d 699 (2d Cir. 1993). To this point, the Supreme Court has not resolved directly the constitutional limitations on such laws as they apply to individual beggars, but has provided clear direction on how they apply to organized charities, not-for-profits and political groups. See Riley v. National Fed'n of the Blind of North Carolina, Inc., 487 U.S. 781, 789 (1988); Secretary of State of Md. v. Joseph H. Munson Co., 467 U.S. 947, 959-60 (1984); Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 632 (1980).

To the extent the Indianapolis ordinance could be enforced against organized charities, such as the United Way, Salvation Army or others, the Supreme Court's holding in Schaumburg would control resolution of the case. In Schaumburg, the Supreme Court considered a local prohibition on solicitation by charities that did not use a certain percentage of their contributions for charitable purposes. 444 U.S. at 623-24. As a threshold consideration, the Court determined that solicitations by organized charities were entitled to First Amendment protection. Id. at 632. The Court found that charities often engage in core First Amendment speech while soliciting donations, and that without such appeals for support, the flow of information on many social, economic, political and cultural topics would cease. As such, the solicitations by organized charities were "within the protection of the First Amendment" although "subject to reasonable regulation." Id.

The Court placed charitable solicitations by organizations in a category of speech close to the heart of the First Amendment, and distinguished it from "purely commercial speech" which is "primarily concerned with providing information about the characteristics and costs of goods and services." Id. Commercial speech, on the other hand, has been placed lower in the First Amendment food chain, somewhere between political speech and pornography. It deserves protection, but authorities are more free to regulate commercial speech than core-value speech.

Other courts examining issues similar to those at hand did not distinguish between solicitation for organized charities and solicitation by individual beggars. The Eleventh Circuit held that "[l]ike other charitable solicitation, begging is speech entitled to First Amendment protection." Smith, 177 F.3d at 956 (citing Schaumburg, 444 U.S. at 632). The Second Circuit likewise held that for First Amendment purposes, the distinction between begging for a charity and begging for one's self is not significant. Loper, 999 F.2d at 704. "We see little difference between those who solicit for organized charities and those who solicit for themselves in regard to the message conveyed." Id. Both Smith and Loper held that limitations on panhandling must be analyzed under the same Schaumburg framework as limitations for charities. Smith, 177 F.3d at 956; Loper, 999 F.2d at 704.

Indeed, the Court's analysis in Schaumburg suggests little reason to distinguish between beggars and charities in terms of the First Amendment protection for their speech. Solicitation, the Court reasoned, "is characteristically intertwined with informative and perhaps persuasive speech" which the First Amendment protects. Schaumburg, 444 U.S. at 632. Because they are intimately connected, solicitation cannot be restricted without also risking the flow of information. Importantly, the Schaumburg Court expressly rejected the suggestion that the message and the solicitation could be considered severable. Id. at 628-32. The village had argued that the ordinance prohibited only the request for money and left the charity free to propagate its views, but the Court called this view of the First Amendment protection for solicitors "too limited." After extensively reviewing its own case law on the subject, the Court held that restrictions on a charity's request for money necessarily implicate restrictions on speech itself. Id. at 632.

Similarly, the Indianapolis ordinance protects the communication of ideas by solicitors and

limits only the bare request for cash. Yet the two can be closely intertwined. Beggars at times may communicate important political or social messages in their appeals for money, explaining their conditions related to veteran status, homelessness, unemployment and disability, to name a few. Like the organized charities, their messages cannot always be easily separated from their need for money. While some communities might wish all solicitors, beggars and advocates of various causes be vanished from the streets, the First Amendment guarantees their right to be there, deliver their pitch and ask for support. See Schaumburg, 444 U.S. at 632 ("[C]haritable appeals for funds, on the street or door to door, involve a variety of speech interests . . . that are within the protection of the First Amendment."). Neither the parties to this appeal nor any authorities found by this Court suggest we should distinguish between restrictions on organized charities and individuals for purposes of understanding the First Amendment guarantees. Therefore, assuming for the purposes of this appeal that some panhandler speech would be protected by the First Amendment, we find that Schaumburg provides the appropriate standard to analyze this claim./1

After recognizing a First Amendment right to solicit money in public places, the Schaumburg Court held that a government may enact "reasonable regulations" so long as they reflect "due regard" for the constitutional interests at stake. 444 U.S. at 632. The parties assume that the proper analysis to determine whether the Indianapolis ordinance is one such reasonable regulation is that set out for "time, place and manner" restrictions in Perry, 460 U.S. at 45. Because the Indianapolis ordinance does not ban all panhandling, we agree that the law could be understood as a time, place or manner regulation. See Cantwell v. Connecticut, 310 U.S. 296, 304 (1940). Under Perry, governments may "enforce regulations of the time, place and manner of expression which are content neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." 460 U.S. at 45. Other courts considering restrictions on solicitation also have applied the time, place, manner analysis from Perry. See Smith, 177 F.3d at 956; ISKCON of Potomac, Inc. v. Kennedy, 61 F.3d 949, 953 (D.C. Cir. 1995); Loper, 999 F.2d at 704-05.

Colorable arguments could be made both for and against the idea that the Indianapolis ordinance is a content-neutral time, place or manner restriction. The Supreme Court has held that "[g]overnment regulation of expressive activity

is content neutral so long as it is 'justified without reference to the content of the regulated speech.'" Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (citation omitted). To help apply this somewhat circular definition, the Court instructed that the principal inquiry is "whether the government has adopted a regulation of speech because of disagreement with the message it conveys." Id. In City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 428-29 (1993), the Court held that a ban on newsracks containing commercial handbills but not newspapers was content-based because "whether any particular newsrack falls within the ban is determined by the content of the publication resting inside that newsrack." Similarly here, whether a solicitor violates the ordinance depends on whether he asked for cash rather than for something else. On one side of the argument, the city ordinance does not prohibit all solicitation on city streets, only solicitations for immediate cash donations. One could, for instance, ask passers-by for their signatures, time, labor or anything else, other than money. Only by determining the specific content of a solicitor's speech could authorities determine whether they violated the ordinance, which would seem to be a content-based restriction. See id. at 429; Ward, 491 U.S. at 791. But as Ward and more recently Hill v. Colorado, 120 S.Ct. 2480, 2491 (2000), emphasized, the inquiry into content neutrality in the context of time, place or manner restrictions turns on the government's justification for the regulation. Because the parties here agree that the regulations are content neutral, we need not decide whether the Indianapolis ordinance can be justified without reference to the content of the regulated speech. Thus the Indianapolis ordinance should be upheld if it is narrowly tailored to achieve a significant governmental purpose and leaves open alternate channels of communication.

The city has a legitimate interest in promoting the safety and convenience of its citizens on public streets. See Madsen v. Women's Health Center, 512 U.S. 753, 768 (1994) (holding that the state "also has a strong interest in ensuring the public safety and order, in promoting the free flow of traffic on public streets and sidewalks . . ."); Heffron v. International Soc. for Krishna Consciousness, Inc., 452 U.S. 640, 650 (1981) (recognizing state interest in safety and convenience of citizens using public fora); Cox v. New Hampshire, 312 U.S. 569, 574 (1941) (recognizing state interest in safety and convenience on public roads); Ayres v. City of Chicago, 125 F.3d 1010, 1015 (7th Cir. 1997) ("There are unquestionable benefits from regulating peddling, First Amendment or

otherwise, [including] the control of congestion."). The plaintiff concedes this much, but argues that a total nighttime ban on verbal requests for alms is substantially broader than necessary and therefore cannot be considered narrowly tailored. However, a government regulation can be considered narrowly tailored "so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." Ward, 491 U.S. at 799. This means the regulation need not be a perfect fit for the government's needs, but cannot burden substantially more speech than necessary. Id. at 800. Furthermore, a time, place or manner restriction need not be the least restrictive means of achieving the government purpose, so long as it can be considered narrowly tailored to that purpose. Id. at 797.

The city determined that vocal requests for money create a threatening environment or at least a nuisance for some citizens. Rather than ban all panhandling, however, the city chose to restrict it only in those circumstances where it is considered especially unwanted or bothersome-- at night, around banks and sidewalk cafes, and so forth. These represent situations in which people most likely would feel a heightened sense of fear or alarm, or might wish especially to be left alone. By limiting the ordinance's restrictions to only those certain times and places where citizens naturally would feel most insecure in their surroundings, the city has effectively narrowed the application of the law to what is necessary to promote its legitimate interest.

Finally, the plaintiff contends that the statute fails to provide ample alternative channels of communication. We disagree. An adequate alternative does not have to be the speaker's first or best choice, see Heffron, 452 U.S. at 647, or one that provides the same audience or impact for the speech. See Ward, 491 U.S. at 802; Cornelius v. NAACP Legal Defense and Educational Fund, Inc., 473 U.S. 788, 809 (1985) (holding that in context nonpublic forum, an ample alternative does not need to be the most efficient one for speaker's purposes). However, the Court has "shown special solicitude for forms of expression that are much less expensive than feasible alternatives," City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 812 n.30 (1984), and so an alternative must be more than merely theoretically available. It must be realistic as well. See Linmark Assocs., Inc. v. Township of Willingboro, 431 U.S. 85, 93 (1977). Furthermore, an adequate alternative cannot totally foreclose a speaker's ability to reach one audience even if it allows the speaker

to reach other groups. See Bery v. City of New York, 97 F.3d 689, 698 (2d Cir. 1996) (holding that total ban on sidewalk art does not leave open alternative means of communication because alternative display in galleries or museums would not reach the same audience.)

The Indianapolis ordinance allows many feasible alternatives to reach both the daytime and nighttime downtown Indianapolis crowds. Under the ordinance, panhandlers may ply their craft vocally or in any manner they deem fit (except for those involving conduct defined as aggressive) during all the daylight hours on all of the city's public streets. Gresham contends that soliciting at night is vital to his survival, a fact we do not dispute, but the ordinance leaves open many reasonable ways for him to reach the nighttime downtown crowd. He may solicit at night, so long as he does not vocally request money. He may hold up signs requesting money or engage in street performances, such as playing music, with an implicit appeal for support. Although perhaps not relevant to street beggars, the ordinance also permits telephone and door-to-door solicitation at night. Thus to the extent that "give me money" conveys an idea the expression of which is protected by the First Amendment, solicitors may express themselves vocally all day, and in writing, by telephone or by other non-vocal means all night. Furthermore, they may solicit in public places on all 396.4 square miles of the city, except those parts occupied by sidewalk cafes, banks, ATMs and bus stops. This is a far cry from the total citywide ban on panhandling overturned by the court in Loper, 999 F.2d at 705 ("[A] statute that totally prohibits begging in all public places cannot be considered 'narrowly tailored.'"), or the total ban on panhandling in a five-mile area of public beach upheld by the court in Smith, 177 F.3d at 956.

B.  Vagueness

Gresham next challenges certain provisions of the ordinance as unconstitutionally vague. Specifically, he contends that the definition of aggressive panhandling in sections (d)(4) and (d)(5) are not sufficiently clear to direct authorities on the enforcement of the law, nor to allow panhandlers such as Gresham to avoid violating the law. Section (d)(4) prohibits "[f]ollowing behind, ahead or alongside a person who walks away from the panhandler after being solicited." Gresham argues hypothetically that police could cite a person for inadvertently violating this section merely by walking in the same direction as the solicited person, without intending to engage in "aggressive panhandling."

Also, section (d)(5) refers to making a person "fearful or feel compelled" without defining what the terms mean in relation to panhandling. A generalized guilt at economic inequality might make one "feel compelled" even by the meekest request for money.

The void-for-vagueness doctrine forbids the enforcement of a law that contains "terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application." Roberts v. United States Jaycees, 468 U.S. 609, 629 (1984) (quoting Connally v. General Construction Co., 269 U.S. 385, 391 (1926)). Legislative enactments must articulate terms "with a reasonable degree of clarity" to reduce the risk of arbitrary enforcement and allow individuals to conform their behavior to the requirements of the law. Id. A statute that "vests virtually complete discretion in the hands of the police" fails to provide the minimal guidelines required for due process. See Kolender v. Lawson, 461 U.S. 352, 358 (1983).

In assessing the constitutionality of an allegedly vague state law or ordinance, "a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494 n.5 (1982) ("Hoffman Estates"); see also Roberts, 468 U.S. at 630-31; Kolender, 461 U.S. at 355 & n.4. In this case, the Indiana courts have not yet had an opportunity to interpret the terms of the Indianapolis ordinance, and so we have no authoritative judicial construction of its terms. See generally, Brownsburg Area Patrons Affecting Change v. Baldwin, 714 N.E.2d 135, 141 (Ind. 1999) ("We have regularly said that courts have an overriding obligation to construe our statutes in such a way as to render them constitutional if reasonably possible.") (internal quotation and citations omitted). However, the rule that federal courts should defer to state court interpretations of state laws, see City of Chicago v. Morales, 527 U.S. 41 (1999), also discourages federal courts from enjoining statutes that could be easily narrowed by a state court to avoid constitutional problems. See Erznoznik v. City of Jacksonville, 422 U.S. 205, 216 (1975) ("[A] state statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts.") (citing Dombrowski v. Pfister, 380 U.S. 479, 497 (1965)). Therefore, we will not hold a vague statute unconstitutional if a reasonable interpretation by a state court could render it constitutional in some application.

Laws must contain a "reasonable degree of clarity" so that people of "common intelligence" can understand their meaning. Roberts, 468 U.S. at 629. Furthermore, because the penalties for noncompliance are less severe, laws imposing civil rather than criminal penalties do not demand the same high level of clarity. See Hoffman Estates, 455 U.S. at 498-99. Like the civil sanction at issue in Hoffman Estates, Gresham faces only a fine for noncompliance with the Indianapolis law. However, this lowered burden is mitigated by the fact that the Indianapolis ordinance potentially interferes with the right of free speech, suggesting that a "more stringent vagueness test should apply." Id. at 499 (citing Papachristou v. City of Jacksonville, 405 U.S. 156, 162 (1972) and Grayned v. City of Rockford, 408 U.S. 104, 109 (1972)).

The challenged provisions in this case define what the City Council meant by the term "aggressive panhandling" and must be read in that context. The district court was rightly concerned that Paragraph (d) could be construed as offering an incomplete list of examples of prohibited behavior, leaving open the possibility that other unspecified actions might also be considered illegal, which would raise serious due process concerns. The district court suggested that the list might be exclusive rather than illustrative, a reasonable interpretation which, if adopted by the Indiana courts, would save it from a vagueness challenge.

Likewise, Paragraphs (d)(4) and (d)(5) are subject to reasonable interpretations that answer the vagueness challenge. A state court interpreting Paragraph (d)(4) may read it to prohibit "following" only in the context of a continued request for money such that the victim reasonably interprets the behavior as a threat. A continuing request for a donation coupled with "following" would be prohibited, but walking in the same direction as the solicited person would not be against the law if the walking were divorced from the request. Construed this way, the statute would prohibit the type of harassing behavior that governments routinely outlaw. See, e.g., Ind. Code sec. 35-45-2-1 (prohibiting as intimidation a threat by words or action that forces a person to engage in conduct against their will); Ind. Code sec. 35-45-10-1 (prohibiting as stalking a "course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened."); Johnson v. State, 648 N.E.2d 666, 670 (Ind. Ct. App. 1995)

(upholding stalking statute against vagueness challenge). Numerous cases hold that governments may proscribe threats, extortion, blackmail and the like, "despite the fact that they criminalize utterances because of their expressive content." United States v. Hayward, 6 F.3d 1241, 1259 (7th Cir. 1993) (Flaum, J., concurring); see, e.g., Watts v. United States, 394 U.S. 705, 707 (1969) (upholding constitutionality of law against threatening life of the President); United States v. Velasquez, 772 F.2d 1348, 1357 (7th Cir. 1985) (holding that threats of physical violence are not protected by First Amendment); see also R.A.V. v. City of St. Paul, 505 U.S. 377, 420 (1992) (Stevens, J., concurring) (quoting Frederick Schauer, Categories and the First Amendment: A Play in Three Acts, 34 Vand. L. Rev. 265, 270 (1981)) ("Although the First Amendment broadly protects 'speech,' it does not protect the right to 'fix prices, breach contracts, make false warranties, place bets with bookies, threaten, [or] extort.'").

Paragraph (d)(5) could be construed to prohibit "any statement, gesture, or other communication" that makes a reasonable person feel they face danger if they refuse to donate, that they are being compelled out of physical fear. The possibility that a polite request for a donation might be heard as a threatening demand by an unusually sensitive or timid person is eliminated by the "reasonable person" standard included in the ordinance. A statement that makes a reasonable person feel compelled to donate out of physical fear amounts to a prohibition on robbery or extortion, which of course would be constitutional. While it is not a certainty that the state courts would adopt constitutional interpretations of the panhandling provisions, they are entitled to the opportunity to do so, and we will not interfere with that right. The district court did not err in refusing to enjoin the ordinance based on the vagueness concerns.

III. Conclusion

For the foregoing reasons, we Affirm the district court's denial of a permanent injunction and dismissal of Gresham's complaint.


/1 As an aside, we note that the Court in Schaumburg distinguished solicitation from commercial speech, which is "primarily concerned with providing information about the characteristics and costs of goods and services." 444 U.S. at 632. The Eleventh Circuit, noting that the parties did not raise the argument, declined to reach the issue of whether panhandling could be

considered commercial speech and therefore subject to more regulation. See Smith, 177 F.3d at 956 n.2. We too will follow that prudent approach and not decide an issue the parties declined to raise. See generally Robert C. Ellickson, Controlling Chronic Misconduct in City Spaces: Of Panhandlers, Skid Rows, and Public-Space Zoning, 105 Yale L.J. 1165, 1229 (1996) (discussing possibility of treating begging as commercial speech). In any event, considering the Supreme Court's definition of commercial speech as outlined in Schaumburg, we doubt panhandling falls into this classification.