David **RICHEY**, et al., Plaintiffs,

v.

John **TYSON**, Jr., etc., et al., Defendants.

No. CIV. A. 99–0824–RVS.

United States District Court, S.D. Alabama, Southern Division.

Nov. 13, 2000.

Vaughan Drinkard, Jr., Mark R. Ulmer, Ulmer, Hillman, Ballard and Nikolakis, Michael L. Cumpton, Drinkard, Newton, Cumpton & Lassiter, Charles H. Hillman, Mobile, James Bopp, Jr., Brandon Chad Bungard, Bopp, Coleson & Bostrom, Terre Haute, IN, for David A. Richey, Margie Richey, Christian Coalition of Alabama, plaintiffs.

Courtney W. Tarver, Alabama Department of Mental, Health and Mental Retardation, Montgomery, AL, John J. Park, Jr., Deputy, Attorney Gen., Bill Clifford, Office of the Attorney General, State of Alabama, Montgomery, AL, Raymond Lewis Jackson, Jr., Jackson & Armstrong, P.C., Auburn, AL, for John M. Tyson, Jr., District Attorney, in his official capacity as the District Attorney for the 13th Circuit in Mobile, Alabama, and as a representative of the class of District Attorneys in the State of Alabama, William Pryor, in his official capacity as Attorney General of the State of Alabama, defendants.

### ORDER ON MOTIONS FOR SUMMARY JUDGMENT

VOLLMER, District Judge.

This matter is before the Court on the parties' competing motions for summary judgment. (Docs.53, 57). The parties have submitted numerous briefs addressing their respective motions. (Docs.54, 58, 61–64, 66, 68, 75–76).[1] After careful consideration of the parties' arguments as set forth in these filings and at oral argument, as well as all other relevant materials in the file, the Court concludes that both

1. The plaintiffs' motions to exceed page limits, (Docs.55, 65), are granted.

motions are due to be granted in part and denied in part.

## BACKGROUND

This case requires the Court to explore the complex and often subtle contours of the First Amendment as it pertains to restrictions on election financing.

Suit was brought by David and Margie Richey (collectively, the "Richeys") and the Christian Coalition of Alabama, Inc. ("CCA"). CCA is a non-profit, tax-exempt Alabama corporation whose purpose is to educate, inform and mobilize Christians to become active in the public arena in support of causes reflecting Christian values and to uphold, propagate and disseminate Christian principles and values by all lawful means. (Doc. 70 at 3). The Richeys apparently are not members of CCA but have received CCA communications in the past. (Doc. 1 at 6).

CCA has in the past spent over $1,000 a year to produce and distribute communications concerning public issues and candidates' positions on them. CCA has never expressly advocated the election or defeat of a candidate for public office, and any such communication would exceed its mission. (Doc. 70 at 4).

CCA has not historically expended funds to expressly advocate the passage or defeat of any constitutional amendment or other ballot measure. However, in 1999 the Alabama Legislature submitted to popular vote a proposed constitutional amendment to allow a state lottery. *See generally* Ala. Const. Art. IV, § 65 (forbidding the legislature to authorize lotteries); *id.* amend. 24 (establishing a procedure for adopting constitutional amendments). CCA formed the intention to distribute, at a cost exceeding $1,000, voter guides explicitly urging voters to reject the proposed constitutional amendment. However, CCA elected not to do so because it understood that taking such action would subject it to the provisions of Alabama's Fair Campaign Practices Act ("FCPA"), Ala.Code §§ 17–22A–1 to –23, which carries consequences and imposes obligations that CCA was unwilling to accept. (Doc. 70 at 4).

On September 8, 1999, approximately five weeks before the scheduled vote on the proposed constitutional amendment, the plaintiffs filed this action. (Doc. 1).[2] At the same time, they filed motions for a temporary restraining order and for a preliminary injunction to enjoin enforcement of the FCPA. (Docs.2, 3). Following extensive briefing, the Court heard oral argument of the plaintiff's motions on September 16, 1999 and, by order dated September 20, 1999, the Court denied both motions. On October 12, 1999, the proposed constitutional amendment was defeated.

## PLAINTIFFS' CONTENTIONS

The FCPA, enacted in 1988, imposes requirements on candidates, principal campaign committees and political committees. A "political committee" is defined to include "[a]ny ... association ... or other group of one or more persons which receives or anticipates receiving contributions or makes or anticipates making expenditures to or on behalf of any ... proposition ...." *Id.* § 17–22A–2(a)(10). A "proposition" includes any proposal submitted to popular vote. *Id.* § 17–22A–2(12). A "contribution" or an "expenditure" includes, with certain exceptions, "anything of value ... made for the purpose of influencing the result of an election." *Id.* § 17–22A–2(a)(2)a, –2(a)(4)a. An "election" includes "any election at which a constitutional amendment or other proposition is submitted to the popular vote." *Id.* § 17–22A–2(a)(3).

As noted, political committee status arises upon the anticipated or actual re-

---

**2.** The complaint named as defendants John Tyson, Jr. in his official capacity as District Attorney and William Pryor in his official capacity as Attorney General. Governor Don Siegelman moved to intervene as a defendant, which motion was granted. (Docs.11, 14).

ceipt of contributions or making of expenditures on behalf of any proposition. A political committee is thereafter required to comply with certain registration, organizational, recordkeeping and reporting requirements. In brief, a political committee must file a statement of organization, Ala. Code § 17–22A–5; open a bank account and appoint a treasurer to keep an account of contributions, expenditures, contributors and recipients, *id.* §§ 17–22A–3, –6; and file periodic reports, open for public inspection, that disclose the identity of each person making contributions or receiving expenditures of over $100 within the calendar year. *Id.* §§ 17–22A–8, –10(a), –11(2).

The plaintiffs allege that these provisions of the FCPA violate the First Amendment in the following ways:

- they purport to apply to groups, such as CCA, that engage exclusively in issue advocacy;

- they purport to apply to groups, such as CCA, whose major purpose is not to expressly advocate an election result;

- they purport to apply to groups, such as CCA, that expressly advocate the passage or defeat of a ballot measure, without any compelling state interest in such regulation;

- they purport to apply to groups, such as CCA, that expressly advocate the passage or defeat of a ballot measure without employing narrowly tailored means;

- they abridge the Richeys' right to receive speech from CCA.

The plaintiffs seek a declaration that the challenged portions of the FCPA are unconstitutional on their face and as applied and an injunction permanently barring their enforcement against CCA. (Doc. 1 at 14–19).

**3.** The following determinations of uncontroverted fact have been taken, where possible, from those facts agreed to by the parties in

## DETERMINATIONS OF UNCONTROVERTED FACT[3]

CCA is a non-profit, non-stock corporation incorporated in the State of Alabama. It is exempt from federal income tax under 26 U.S.C. § 501(c)(4). It is not associated with any political candidate, political party or campaign committee. Its purposes are to educate, inform and mobilize Christians to become active in the public arena in support of causes which reflect Christian values, and to uphold, propagate and disseminate by all lawful means Christian principles and values. CCA's total budget for the two-year election cycle 1998–1999 is approximately $230,000. (Doc. 70 at 3).

To further its purposes, CCA has in the past spent more than $1,000 in a single calendar year to produce and distribute communications about important public issues and candidates' positions on them, without in explicit words or by express terms advocating the election or defeat of a clearly identified candidate. CCA has not in the past expressly advocated the nomination or election or defeat of any clearly identified candidate. It has no intention of doing so in the future, and any such communication would exceed CCA's mission. (Doc. 70 at 3–4).

A ballot measure regarding gambling was voted on by the people of Alabama on October 12, 1999. CCA desired to receive contributions regarding the gambling ballot measure in excess of $1,000 and to expend over $1,000 during 1999 to prepare and distribute voter guides expressly urging voters to reject the gambling proposal. CCA decided not to publish the voter guides because it did not want to comply with all of the political committee requirements in the FCPA and did not want to suffer what it believes to be the adverse consequences of complying with the Act. (Doc. 70 at 4).

the joint pretrial document, (Doc. 70), and/or in their responses to their opponents' proposed uncontroverted facts. (Docs. 61, 63).

The November 7, 2000 ballot includes a ballot measure concerning use of certain state trust funds. CCA desires to spend over $1,000 to produce and distribute voter guides expressly advocating passage or defeat of this measure, but will not do so for the same reasons it did not expressly advocate defeat of the November 1999 gambling proposal. (Doc. 76, Exhibit 1). CCA anticipates that future ballot measures will be submitted to the voters and that CCA will desire to spend over $1,000 in a calendar year to expressly advocate passage or defeat of such measures. (Doc. 61 at 3).

Spending money to urge voters to vote for or against a ballot measure, or otherwise engaging in express advocacy, is not, and will not become, the major purpose for which CCA exists. (Doc. 61 at 2; Doc. 70 at 3–4).

The primary method of distribution for CCA's voter guides has been, and remains, as inserts to church bulletins, which are handed out to various congregations during church services. This is the primary method of distribution CCA plans to use for its voter guides urging the passage or defeat of any future ballot measure. (Doc. 70 at 9). Some churches that have previously distributed CCA voter guides would refuse to do so if CCA is deemed a political committee out of fear that their legal status would be negatively affected, as by losing tax-exempt status under 26 U.S.C. § 501(c)(3). (Doc. 54, Exhibits I–M).

CCA has about 2,500 contributors per calendar year. Some individuals give over $1,000 in a calendar year, and some give less than $1,000 but more than $100. (Doc. 70 at 9). Some contributors will stop contributing to CCA if it is required to disclose the identity of those contributing over $100 in a calendar year. (Doc. 54, Exhibits O–T). Some husband and wife contributors that have previously contributed over $1,000 in a calendar year will stop contributing to CCA if it is deemed a political committee for fear they will also be deemed a political committee. (Id., Exhibits S–T). If CCA is deemed a political

committee, some of its contributors will no longer contribute because they do not give to political committees as a matter of personal choice. (Id., Exhibit A at 4).

The Richeys have in the past benefitted from receiving CCA's communications. They would like to continue to receive these communications, including those regarding important ballot measures, and including materials concerning the 1999 lottery proposal. (Doc. 70 at 9).

## CONCLUSIONS OF LAW

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Federal Rule of Civil Procedure 56(c). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). Once the moving party has satisfied his responsibility, the burden shifts to the nonmoving party to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH–Siegen*, 965 F.2d 994,

999 (11th Cir.1992) (internal citations and quotations omitted).

## I. Threshold Issues.

Before reaching the merits of the plaintiffs' claims, the Court must first determine the existence of a justiciable case or controversy.

### A. Standing.

■ The doctrine of standing encompasses both jurisdictional and prudential concerns. *E.g., Bischoff v. Osceola County,* 222 F.3d 874, 883 (11th Cir.2000). At least to the extent that standing is a jurisdictional matter, the Court is obligated to confirm its existence, regardless of any challenge by the parties. *United States v. Hays,* 515 U.S. 737, 742, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995).

■ The "irreducible constitutional minimum of standing" is three-fold: (1) "the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, ... and (b) 'actual or imminent, not "conjectural" or "hypothetical" ' '"; (2) "there must be a causal connection between the injury and the conduct complained of", such that "the injury [is] 'fairly ... trace[able] to the challenged action of the defendant'"; and (3) "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)(quoting earlier Supreme Court decisions). Standing "must exist at the commencement of the litigation," *Arizonans for Official English v. Arizona,* 520 U.S. 43, 68 n. 22, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997)(quoting *United States Parole Commission v. Geraghty,* 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980)), and "a plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.,* 528 U.S. 167, 120 S.Ct. 693, 706, 145 L.Ed.2d 610 (2000).

■ Special rules exist for gauging injury in fact in the First Amendment context. "In the First Amendment realm, plaintiffs do not have to expose themselves to enforcement in order to challenge a law," but may show they have foregone expression to avoid enforcement. *Wilson v. State Bar,* 132 F.3d 1422, 1428 (11th Cir.1998). "When a plaintiff brings a pre-enforcement challenge to a sanctioning statute, regulation or ordinance, standing exists at the summary judgment stage when the plaintiff has submitted evidence indicating 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution.'" *Id.* (quoting *Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979))(emphasis omitted). To be credible, the threat of prosecution must be "genuine," *White's Place, Inc. v. Glover,* 222 F.3d 1327, 1329 (11th Cir.2000), and the plaintiff's fear of prosecution " 'objectively reasonable.'" *Wilson v. State Bar,* 132 F.3d at 1428 (quoting *New Hampshire Right to Life Political Action Committee v. Gardner,* 99 F.3d 8, 14 (1st Cir.1996)). This three-part test is satisfied.

■ CCA has expressed its intention to spend over $1,000 engaged in expressly advocating the passage or defeat of ballot measures, activity that constitutes "core political speech." *McIntyre v. Ohio Elections Commission,* 514 U.S. 334, 347, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995). However, CCA desires to do so without complying with the registration, organizational, recordkeeping and reporting requirements applicable to political committees. A credible threat of resulting prosecution exists. By its terms, the FCPA makes the violation of any of its provisions, including its registration, organizational, recordkeeping and reporting requirements, a misdemeanor subject to fine and imprisonment. Ala.Code § 17–22A–22(a), (b). The attorney general is

authorized to prosecute violations of the FCPA. *Id.* § 17–22A–22(c). The defendants insist that the CCA's proposed conduct would violate the FCPA, (Doc. 18, Exhibit A at 2), and they have presented no evidence that CCA would not be prosecuted for pursuing such a course of conduct.[4] *See, e.g., Babbitt v. United Farm Workers,* 442 U.S. at 302, 99 S.Ct. 2301 (where the plaintiffs' proposed conduct facially violated a sanctioning statute and "the State has not disavowed any intention of invoking the criminal penalty provision," a credible threat of prosecution existed).

The second and third constitutional requirements for standing are clearly present as well. CCA's alleged injury—the infringement on its First Amendment rights—is directly attributable to the Alabama statute regulating groups engaged in political speech, and a ruling declaring that the challenged portions of the FCPA are unconstitutional and enjoining their enforcement against CCA would necessarily redress its injury. *See, e.g., New Hampshire Right to Life v. Gardner,* 99 F.3d at 13.

■ The prudential concerns addressed by the standing doctrine include whether the plaintiff's complaint falls within the zone of interests protected by the constitutional provision at issue, whether it raises abstract questions more appropriately resolved by the legislature, and whether the plaintiff is asserting its own rights or those of a non-party. *Bischoff v. Osceola County,* 222 F.3d at 883. None of these concerns is at issue in this lawsuit.

The plaintiffs do not question only the obligations imposed on political committees by the FCPA. In addition, they challenge the FCPA's use of the term "political committee" to describe those engaged in certain election activity, because the adverse reaction to the label by contributors to, and distributors of, CCA's message will prompt CCA to restrict its speech to avoid the label from attaching. Although the FCPA's definitional provision carries no accompanying sanction, CCA nevertheless has standing to assert its challenge to the "political committee" terminology.

In *Meese v. Keene,* 481 U.S. 465, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987), the Court held that the plaintiff state legislator had standing to raise a First Amendment challenge to a federal statute labeling certain foreign films as "political propaganda," based on his showing that he was deterred from exhibiting the films because the "political propaganda" label would harm both his reputation and his chances for re-election. *Id.* at 473–77, 107 S.Ct. 1862. CCA similarly has standing to challenge the "political committee" label.

In summary, CCA has standing to challenge the alleged violations of its own constitutional rights.[5]

## B. Mootness.

■ Because the vote on whether to amend the Alabama Constitution to allow a state lottery is now past, the defendants argue that the parties' controversy is moot. (Doc. 75 at 3).

In *First National Bank v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), the Supreme Court held that the First Amendment challenge mounted by several corporations and banking associations to a state law that forbade them from making contributions or expenditures to influence the vote on any ballot measure concerning individual income taxation was not mooted by the occurrence of the election because the controversy was " 'capa-

---

4. The submitted affidavit of an assistant attorney general states only that she is aware of no criminal action taken against any organization that did *not* expressly advocate voting for or against a ballot question. (Doc. 18, Exhibit A at 3).

5. Because CCA has standing to raise all the claims asserted in this lawsuit, it is unnecessary to address separately the Richeys' standing.

ble of repetition, yet evading review.' " *Id.* at 774, 98 S.Ct. 1407 (quoting *Southern Pacific Terminal Co. v. Interstate Commerce Commission,* 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911)); *see also, e.g., Teper v. Miller,* 82 F.3d 989, 992 & n. 1 (11th Cir.1996)(applying *Bellotti* to a challenge to a state law prohibiting legislators from accepting campaign contributions during any legislative session); *American Civil Liberties Union v. Florida Bar,* 999 F.2d 1486, 1488, 1496 (11th Cir.1993)(applying *Bellotti* to a challenge to a state canon of judicial conduct governing campaign speech).

The two elements of this exception to the mootness doctrine are: " '(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again.' " *First National Bank v. Bellotti,* 435 U.S. at 774, 98 S.Ct. 1407 (quoting *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975)).

The defendant does not challenge the plaintiffs' assertions that the ballot measure concerning a state lottery was placed on the ballot April 14, 1999 and that the six-month time frame from placement to vote is typical of Alabama ballot measures. (Doc. 76 at 6 n. 1).[6] Nor do they disagree that six months is "too short a period of time for [plaintiffs] to obtain complete judicial review." *First National Bank v. Bellotti,* 435 U.S. at 774, 98 S.Ct. 1407. Thus, the first element is satisfied.

There appear to be three facets of the "reasonable expectation" element: (1) whether there exists a reasonable expectation that future ballot measures will arise; (2) whether there exists a reasonable expectation that CCA will desire to expend over $1,000 to expressly advocate passage or defeat of such ballot measures; and (3) whether there exists a reasonable expecta-

tion that the state will seek to enforce the FCPA against CCA. *See First National Bank v. Bellotti,* 435 U.S. at 775, 98 S.Ct. 1407 (addressing each facet). The threshold of a "reasonable expectation" is lower than that of a "demonstrated probability." *Honig v. Doe,* 484 U.S. 305, 319 n. 6, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988).

The Court concludes that the reasonable expectation element is satisfied. First, there is no question that future ballot measures will arise. *Cf. First National Bank v. Bellotti,* 435 U.S. at 775, 98 S.Ct. 1407 ("Appellee's suggestion that the legislature may abandon its quest for a constitutional amendment is purely speculative."). Second, CCA's president has declared that CCA would spend over $1,000 to expressly advocate passage or defeat of future ballot measures, including a measure on the November 7, 2000 ballot, but for the FCPA. (Doc. 20, Attachment 1 at 2; Doc. 54, Exhibit A at 1–2; Doc. 76, Exhibit 1). *See First National Bank v. Bellotti,* 435 U.S. at 775, 98 S.Ct. 1407 ("Appellants insist that they will continue to oppose the constitutional amendment ....."). Finally, and as noted, the defendants do not deny that the state would seek to enforce the FCPA against CCA should it spend over $1,000 to expressly advocate passage or defeat of a ballot measure. *See id.* ("[T]here is no reason to believe that the Attorney General will refrain from prosecuting violations of § 8.").

The defendants, rather than challenging any of the foregoing, insist that the plaintiffs' "claim[s] that they want to make triggering expenditures in future referenda do not give rise to standing" for want of an actual or imminent, concrete and particularized, invasion of a legally protected interest. (Doc. 75 at 4 (citing *Lujan v. Defenders of Wildlife,* 504 U.S. at 560, 112 S.Ct. 2130)). The defendants have thereby confused the related but distinct doctrines of standing and mootness. *See, e.g.,*

6. Constitutional amendments, other than those applicable to only one county, may be voted on "not less than three months after the final adjournment of the session of the legislature at which the amendments were proposed." Ala. Const. amend. 24.

*Friends of the Earth v. Laidlaw Environmental Services,* 120 S.Ct. at 709 (distinguishing standing from mootness and noting that a court may retain jurisdiction over a controversy capable of repetition yet evading review even though the requirements of standing, present when the action was commenced, are no longer satisfied).

In summary, the parties' controversy is not moot because it is capable of repetition, yet evading review.

## II. Merits.

First Amendment challenges to election finance restrictions arise in a wide variety of settings, which affect proper application of the Supreme Court's analysis. Three of the most important variables in gauging the constitutionality of such restrictions are: (1) the type of election to which the restriction applies; (2) the kind of restriction imposed; and (3) the nature of the individual or entity against which the restriction is imposed.

Election finance restrictions may be imposed either with respect to the election (or nomination) of candidates for public office or with respect to constitutional amendments and other ballot measures. CCA desires to engage in express advocacy only with respect to ballot measures, but certain of the plaintiffs' challenges implicate express advocacy with respect to elections to public office as well.

Election finance restrictions may take varied forms, but most often consist of restrictions on expenditures, restrictions on contributions, and disclosure requirements. The plaintiffs here challenge the disclosure requirements of the FCPA, as well as its registration, organizational and recordkeeping requirements.[7]

Election finance restrictions may be imposed against, inter alia, individuals, groups whose major purpose is to engage in election activity, groups whose major purpose lies elsewhere, candidates and office holders, political parties, and official campaign committees. CCA is an organization whose major purpose is not to engage in election activity.

■ "To determine whether [an election finance restriction] may constitutionally be applied ..., we must ascertain whether it burdens the exercise of political speech and, if it does, whether it is narrowly tailored to serve a compelling state interest." *Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 657, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990). CCA desires to distribute voter guides to expressly advocate the passage or defeat of ballot measures. Such activity "is the essence of First Amendment expression," and "[n]o form of speech is entitled to greater constitutional protection." *McIntyre v. Ohio Elections Commission,* 514 U.S. at 347, 115 S.Ct. 1511. Thus, CCA's desired course of conduct constitutes "core political speech" which may not be unconstitutionally burdened. *Id.*

■ The obligations imposed on political committees by the FCPA burden CCA's exercise of its free speech rights by making it more costly to engage in such speech and creating a disincentive to speak. "The fact that the statute's practical effect [in imposing registration, organizational and recordkeeping requirements] may be to discourage protected speech is sufficient to characterize [it] as an infringement on First Amendment activities." *Federal Election Commission v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 255, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986)(plurality); *accord id.* at 265–66, 107 S.Ct. 616 (O'Connor, J., concurring in part and concurring in the judgment); *McIntyre v. Ohio Elections Commission,* 514 U.S. at 355, 115 S.Ct. 1511 ("[M]andatory reporting [of contributions and expenditures] un-

---

7. The plaintiffs also challenge application of the label, "political committee," a contention

addressed separately in Part II.E.

deniably impedes protected First Amendment activity . . . .").

Accordingly, the Court's focus must turn to an assessment of the state's interest and of the means utilized to advance that interest. The plaintiffs, however, argue that no such analysis is required because the FCPA purports to regulate CCA and like organizations in ways that are unconstitutional regardless of the governmental interest or the means employed.

### A. Issue Advocacy.

The plaintiffs argue that all political advocacy must be characterized as either "express advocacy" or "issue advocacy"; that the latter may never, under any circumstances, be infringed by election finance laws; and that communications explicitly advocating the passage or defeat of a ballot measure—including those that CCA desires to disseminate—necessarily and exclusively constitute issue advocacy and are thus beyond the reach of any governmental restriction. They conclude that the FCPA is facially overbroad because it purports to regulate groups that expressly advocate the passage or defeat of ballot measures but which do not expressly advocate the election or defeat of candidates. (Doc. 54 at 15–23).[8]

In *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Supreme Court considered wide-ranging challenges to the Federal Election Campaigns Act ("FECA"). The Court described "[d]iscus-

sion of public issues and debate on the qualifications of candidates [as] integral to the operation of the system of government established by our Constitution [, to which] [t]he First Amendment affords the broadest protection." *Id.* at 14, 96 S.Ct. 612. The Court then recognized à "distinction between discussion of issues and candidates and advocacy of election or defeat of candidates." *Id.* at 42, 96 S.Ct. 612. To avoid problems of vagueness and overbreadth that would otherwise be presented by certain of FECA's provisions, the Court construed them to reach only communications "that *expressly* advocate the election or defeat of a clearly defined candidate." *Id.* at 80, 96 S.Ct. 612 (emphasis added); *see also id.* at 43–44, 96 S.Ct. 612. The Court restricted express advocacy, in turn, to communications utilizing imperative terms such as "vote for [or against]," "support," "defeat" or "reject." *Id.* at 44 n. 52, 96 S.Ct. 612.

In light of *Buckley*, it may not be doubted that a distinction exists between "issue advocacy"[9] and "express advocacy." It may further be assumed for purposes of discussion that issue advocacy automatically lies completely beyond the pale of constitutional governmental regulation. *But see, e.g., Clifton v. Federal Election Commission*, 114 F.3d 1309, 1312 (1st Cir.1997)(noting that Supreme Court cases hint at permissible election finance restrictions adversely affecting issue advocacy),

---

8. The plaintiffs make no argument that the FCPA purports to regulate groups that do not expressly advocate either the election or defeat of a candidate or the passage or defeat of a proposition. (Doc. 54 at 14–15). *See* Ala. Code § 17–22A–2(10)(a political committee is a group anticipating or actually receiving contributions or making expenditures "to or on behalf of" an elected official, proposition, candidate, etc.).

9. The *Buckley* Court did not utilize the phrase "issue advocacy,"and this Court has identified only one Supreme Court opinion attempting to define it. *See Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 120 S.Ct. 897, 914, 145 L.Ed.2d 886 (2000) (Kennedy, J.,

dissenting) (describing "advertisements that promote or attack a candidate's positions without specifically urging his or her election or defeat" as "so-called issue advocacy"). Certain appellate courts, however, have begun to utilize the phrase as a shorthand expression for speech that stops short of explicitly advocating a particular election result. *See, e.g., Vermont Right to Life Committee v. Sorrell*, 221 F.3d 376, 386 (2d Cir.2000); *Mariani v. United States*, 212 F.3d 761, 767 (3rd Cir.2000); *North Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 708 (4th Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 1156, 145 L.Ed.2d 1069 (2000).

*cert. denied,* 522 U.S. 1108, 118 S.Ct. 1036, 140 L.Ed.2d 103 (1998).

■ The plaintiffs' error lies not in detecting a difference between issue advocacy and express advocacy but in extrapolating that "an effort to expressly advocate the passage or defeat of a ballot measure or referendum is pure 'issue advocacy' [that] cannot be regulated" because it is "constitutionally sacrosanct." (Doc. 54 at 18, 22). In short, the plaintiffs argue that a request or direction to vote for or against a candidate is express advocacy and therefore regulable while a request or direction to vote for or against a ballot measure is issue advocacy that cannot be regulated.

The plaintiffs' position is contradicted by the only case they cite as support. In *McIntyre v. Ohio Elections Commission,* 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995), the plaintiff's decedent circulated anonymous handbills opposing a local tax levy. The handbills explicitly requested, "PLEASE VOTE NO ISSUE 19." *Id.* at 337–38 & n. 2, 115 S.Ct. 1511. The Supreme Court, however, neither classified the handbills as pure issue advocacy nor treated them as automatically beyond the reach of governmental regulation. Instead, the Court announced that "[t]he principles enunciated in *Buckley* extend equally to issue-based elections" and applied the same "exacting scrutiny" of means and ends that it utilizes when express advocacy of a candidate is at issue. *Id.* at 347, 115 S.Ct. 1511.

The plaintiffs' confusion appears to derive from *Buckley v. Valeo,* as they repeatedly quote that portion of *Buckley* that restricted the scope of certain FECA provisions to communications "that in express terms advocate the election or defeat *of a clearly identified candidate* for federal office." 424 U.S. at 44, 96 S.Ct. 612 (emphasis added); *accord id.* at 80, 96 S.Ct. 612. *Buckley,* however, was interpreting FECA, a federal statute that by its terms applies only to election to public office; *Buckley's* reference to candidates reflects only the scope of the statutory language at issue, not the scope of constitutionally permissible regulation.

In summary, the speech in which CCA desires to engage constitutes "express advocacy" that is subject to constitutionally permissible restriction.

### B. Major Purpose.

■ The plaintiffs argue that "[t]he major purpose test is a constitutionally required restriction on the regulation of political speech" such that "an organization cannot be required to shoulder the burdens of a committee if it is not its major purpose to expressly advocate the support or passage of a ballot measure." (Doc. 54 at 24). They conclude that the FCPA is facially overbroad because it purports to regulate organizations whose major purpose is not to advocate a particular election result. (*Id.* at 23–44).[10] For this proposition they rely primarily on *Buckley v. Valeo.*[11]

---

**10.** The plaintiffs argue that an organization can have only one major purpose and that it must be measured by its official statements of purpose and/or by where the majority of its spending occurs. (Doc. 54 at 30). Thus, under the plaintiffs' scenario, a large tobacco planter may be able to spend a million dollars to defeat a proposed cigarette tax submitted to popular vote, constitutionally immune from any regulation, while a grass roots organization with a budget of under $2,000 may constitutionally be regulated if it spends $1,001 advocating passage of the same measure.

**11.** As a threshold matter, the plaintiffs inaccurately describe the activity to which the major purpose inquiry relates. The plaintiffs describe the relevant major purpose as one to "expressly advocate" a particular election result, (Doc. 54 at 24), while the Supreme Court has described the relevant major purpose (under FECA) as "the nomination or election of a candidate," *Buckley v. Valeo,* 424 U.S. at 79, 96 S.Ct. 612, or simply "campaign activity," *Federal Election Commission v. Massachusetts Citizens for Life,,* 479 U.S. at 262, terms that comfortably reach beyond explicit directions to vote a particular way.

Among its many provisions, FECA imposed certain disclosure requirements on political committees and other persons. 424 U.S. at 155–60, 96 S.Ct. 612.[12] Required disclosures included the filing of periodic reports reflecting, inter alia, contributions received and expenditures made to any person in an aggregate amount exceeding $100 in a calendar year. *Id.* at 157–58, 96 S.Ct. 612. The disclosure requirements applied to any "political committee," defined as "any ... group ... which receives contributions or makes expenditures during a calendar year in an aggregate amount exceeding $1,000." *Id.* at 145, 96 S.Ct. 612. The disclosure requirements similarly applied to persons (other than candidates or political committees) making contributions or expenditures (other than to candidates or political committees) exceeding $100 a year. *Id.* at 160, 96 S.Ct. 612.

The Supreme Court detected and resolved problems of vagueness and overbreadth in these disclosure requirements. With respect to disclosure of expenditures, defined by statute as something given "for the purpose of ... influencing" an election, 424 U.S. at 147, 96 S.Ct. 612, the Court considered political committees and other persons separately. The Court construed the term "political committee" as limited to groups whose "major purpose" is the nomination or election of a candidate, because expenditures by groups whose major purpose is the election of a candidate can safely be assumed to be "for the purpose of ... influencing" an election. 424 U.S. at 79, 96 S.Ct. 612. With respect to persons other than political committees, however, who by definition do not have as their major purpose the election of a candidate, the Court resolved the vagueness and overbreadth issues by restricting the scope of the term "expenditure" so as "to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." 424 U.S. at 80, 96 S.Ct. 612.

The Supreme Court thereby salvaged from FECA two classes of entities, distinguished by their major purpose and, consequently, by the scope of disclosures to which they may constitutionally be subject. For organizations whose major purpose is election activity, the legislature may require disclosure of substantially all expenditures, regardless of whether they were made for express advocacy; for organizations whose major purpose lies elsewhere, the legislature may require disclosure only of those expenditures used for express advocacy. Thus, the major purpose distinction influences the degree to which an organization may be subject to election finance regulation; it does not determine whether an organization is constitutionally immune from such regulation.

The plaintiffs offer no direct response to this textual reading of *Buckley*. Instead, they cite seven cases for the proposition that "every case since *Buckley* that has considered the 'major purpose' test has found it to be constitutionally mandated." (Doc. 54 at 25). The only Supreme Court case cited by the plaintiffs for this proposition is *Federal Election Commission v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986). *Massachusetts Citizens*, however, simply held that FECA's prohibition on a corporation's expenditures from its general treasury was unconstitutional as applied to a non-profit, non-stock corporation funded by voluntary donations, because any compelling state interest in preventing corporate wealth amassed through commercial activity from being subverted to political ends did not apply to such an entity. 479 U.S. at 256–63, 107 S.Ct. 616. The *Massachusetts Citizens* Court did not hold or suggest that the "major purpose" test is a constitutionally required prerequisite to any regulation of political speech. On the

---

12. Certain relevant amendments to FECA were enacted following *Buckley*. Accordingly, references to the statute as construed by the *Buckley* Court are to the opinion itself, which includes the text of the Act in an appendix.

contrary, the Court, after expressly recognizing that the plaintiff's major purpose was *not* the nomination or election of a candidate, *id.* at 252 n. 6, 253, 107 S.Ct. 616, stated that the plaintiff was nevertheless subject to disclosure of contributions and expenditures pursuant to Section 434(c) of FECA. *Id.* at 262, 107 S.Ct. 616.

In light of *Massachusetts Citizens'* clear rejection of the very proposition for which the plaintiffs argue, extended discussion of the other, lower court cases they cite is unnecessary. Suffice it to say that none holds, and few even remotely suggest, that an organization whose major purpose is not the achievement of particular election results is constitutionally immune from regulation.

In summary, an organization may be subjected to constitutionally permissible election finance restrictions even though its major purpose is not to engage in campaign activity.

### C. Compelling State Interest.

The plaintiffs argue that, even if CCA's proposed speech constitutes express advocacy, and even if such speech may be regulated even though CCA's major purpose is not the passage or defeat of ballot measures, the defendants have established no compelling state interest undergirding the challenged restrictions. (Doc. 54 at 14–15).

What constitutes a compelling interest depends in part on the type of restriction at issue and the kind of election to which it applies. Thus, for example, the Supreme Court found the government's interest in "stemming the reality or appearance of corruption in the electoral process" insufficiently compelling to support FECA's ceilings on independent expenditures, while finding the same interest "constitutionally sufficient" to justify FECA's caps on contributions to candidates and their official committees. *Buckley v. Valeo,* 424 U.S. at 26, 47–48, 96 S.Ct. 612; *see also Federal Election Commission v. Massachusetts Citizens for Life,* 479 U.S. at 259–60, 107 S.Ct. 616 ("We have consistently held that restrictions on contributions require less compelling justification than restrictions on independent spending."). Similarly, the Court found the interest in avoiding the reality or appearance of corruption sufficient to justify caps on contributions to or for candidates for public office but insufficient to justify caps on contributions concerning ballot measures. *Citizens Against Rent Control v. Berkeley,* 454 U.S. 290, 297–98, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981).

### 1. Disclosure requirements.

 The defendants articulate two governmental interests in imposing disclosure requirements concerning ballot measures: (1) deterring corruption and the appearance of corruption; and (2) providing the electorate with information concerning the sources of money spent on ballot propositions and how that money is spent, which "enhances public awareness of the allegiances and interests of groups supporting or opposing ballot propositions." (Doc. 58 at 11).

As noted, "[t]he risk of corruption perceived in cases involving candidate elections ... simply is not present in a popular vote on a public issue." *First National Bank v. Bellotti,* 435 U.S. 765, 790, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). Thus, courts have rejected avoidance of the appearance or actuality of corruption as a state interest sufficiently compelling to justify prohibitions or caps on contributions in support of or in opposition to a ballot measure. *Id.* at 790–92, 98 S.Ct. 1407; *Citizens Against Rent Control v. Berkeley,* 454 U.S. at 296–98, 102 S.Ct. 434; *Let's Help Florida v. McCrary,* 621 F.2d 195, 199–200 (5th Cir.1980), *judgment aff'd,* 454 U.S. 1130, 102 S.Ct. 985, 71 L.Ed.2d 284, *cert. denied,* 454 U.S. 1142, 102 S.Ct. 999, 71 L.Ed.2d 293 (1982).

The defendants suggest that, while concerns over corruption in the ballot measure context may be insufficient to justify

restrictions on contributions, they may nevertheless be sufficiently compelling to justify the lesser intrusion of a disclosure requirement. They continue that there is indeed a danger of corruption in connection with ballot measures because an elected official may, or may appear to, provide favors to those who financially support or oppose ballot measures important to the official. (Doc. 58 at 14–15).

Even if the cases cited above do not rule out the possibility that combating such corruption could constitute a compelling governmental interest sufficient to justify a disclosure requirement, the defendants have offered no empirical evidence that the reality or perception of corruption haunts Alabama ballot measures.[13] As the Supreme Court recently noted, "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Nixon v. Shrink Missouri Government PAC,* 528 U.S. 377, 120 S.Ct. 897, 906, 145 L.Ed.2d 886 (2000). Especially in light of the cases cited above questioning its existence, the fact or perception of corruption in connection with ballot measures is neither so settled nor so inescapable as to obviate its proof. *Cf. id.* at 907 ("We have never accepted mere conjecture as adequate to carry a First Amendment burden ...."). The defendants' second articulated justification for the FCPA's disclosure requirement, however, is sufficiently compelling.[14] In *Let's Help Florida v. McCrary,* the Fifth Circuit stated that "promoting disclosure of campaign contri-

butions [concerning a ballot measure] is an important state interest" and that "Florida can and does effectively promote the disclosure of large contributors through" its statutory registration and reporting requirements. 621 F.2d at 200–01. While this portion of *Let's Help Florida* is dictum (because the Court held that Florida's cap on ballot measure contributions was not narrowly tailored to advance the government's interest in disclosure), it is nonetheless persuasive.

Nor does *Let's Help Florida* stand alone. The Supreme Court in *Citizens Against Rent Control v. Berkeley* recognized that, "when individuals or corporations speak through committees, they often adopt seductive names that may tend to conceal the true identity of the source." 454 U.S. at 298, 102 S.Ct. 434. The Supreme Court found this state interest in "identifying the sources of support for and opposition to ballot measures" insufficient to justify a cap on contributions to local referenda, not because such an interest is inherently incapable of supporting any First Amendment restriction, but because the interest was already satisfactorily advanced by the ordinance's requirement that lists of contributors of over $50 be published in local newspapers before the election. *Id.* at 294 n. 4 & 298–99, 102 S.Ct. 434. "The integrity of the political system will be adequately protected if contributors are identified in a public filing revealing the amounts contributed ...." *Id.* at 299–300, 102 S.Ct. 434. While this portion of *Citizens Against Rent Control* is

---

**13.** The defendants rely only on the testimony of the Secretary of State that knowing the identity of ballot measure supporters could cause a voter to wonder whether they would be rewarded by grateful public officials. (Bennett Deposition at 25–26). The Secretary of State conceded that corruption and the appearance of corruption are merely "possible." (Doc. 16, Exhibit A at 3).

**14.** The plaintiffs' assertion that "[t]he only legitimate and compelling governmental interest that the Supreme Court has recognized that would justify restrictions on fundamental

First Amendment rights is the 'prevent[ion] of corruption or the appearance of corruption,'" (Doc. 54 at 15), misstates the Supreme Court opinion it quotes. What the Court actually stated in *Federal Election Commission v. National Conservative Political Action Committee,* 470 U.S. 480, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985), is that no other compelling state interests have been identified "for restricting campaign finances." *Id.* at 496–97, 105 S.Ct. 1459. This case, of course, implicates no restriction on contributions or expenditures.

dictum, the plaintiffs have suggested no reason why the Supreme Court would hold one election finance restriction to be unconstitutional by relying on another election finance restriction it believed to be unconstitutional as well.[15]

Finally, the Court in *Buckley v. Valeo* identified the government's interest in providing information to voters concerning where political money comes from and how it is spent as a sufficiently important governmental interest to justify the disclosure requirements of FECA, because the information allows voters to "place each candidate in the political spectrum more precisely" and "alert[s] the voter to the interests to which a candidate is most likely to be responsive and thus facilitate[s] predictions of future performance in office." 424 U.S. at 66–67, 96 S.Ct. 612. Providing such information "curb[s] the evi[l] of campaign ignorance." *Id.* at 68, 96 S.Ct. 612. Indeed, the Court viewed this "informational function" as "equally important" an interest as that of preventing corruption. *Id.* at 68 n. 82, 96 S.Ct. 612.[16]

The informational interests served by disclosure requirements in the context of ballot measures are not identical, but they are of equivalent value. In the ballot measure context, disclosure fights "campaign ignorance" by allowing voters to peer beyond "seductive names" and assess the credibility of the message by considering the identity of the true messengers.[17]

The plaintiffs nevertheless assert that the defendants are precluded from establishing a compelling interest in the context of disclosure requirements by *McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995). The plaintiffs read *McIntyre* for the proposition that a speaker's right to anonymity automatically trumps any governmental interest in disclosure. (Doc. 62 at 7–8). *McIntyre*, however, will not carry the weight the plaintiffs place upon it.

The plaintiff's decedent in *McIntyre* distributed anonymous handbills concerning a ballot measure in violation of a state law prohibiting the distribution of anonymous written political communications. 514 U.S. at 337–38 & nn. 2–3, 115 S.Ct. 1511. In holding the law to be unconstitutional, the Court expressly distinguished *Buckley* in that "mandatory reporting is a far cry from compelled self-identification on all election-related writings" because it is much less intrusive, revealing and provocative than the identification of the individual author of a specific handbill on the handbill itself. 514 U.S. at 355, 115 S.Ct. 1511.[18]

---

**15.** The plaintiffs argue that *Let's Help Florida* and *Citizens Against Rent Control* stand only for the proposition that an organization voluntarily electing to register as a political committee may thereafter be saddled with disclosure requirements against its will. (Doc. 54 at 22). They offer no authority or explanation for the remarkable proposition that an organization waives its First Amendment rights by electing to engage in speech that triggers statutory election finance restrictions.

**16.** The plaintiffs argue that *Buckley* expressly restricted the range of constitutionally permissible disclosure requirements to campaigns for public office. (Doc. 54 at 39–40). As noted, however, *Buckley* addressed a federal statute which by its terms was limited to such campaigns, and its references to candidates does not reflect the bounds of constitutionally permissible regulation but only of the statute under consideration.

**17.** As a hypothetical but revealing example, the import of an express advocacy campaign against an Alabama state lottery would depend greatly on whether voters were aware only that it was paid for by CCA or were also aware that CCA's primary contributors towards the campaign were Mississippi gambling interests. The plaintiffs' apparently straight-faced assertion that this information is immaterial to voters' assessment of the message, (Doc. 62 at 9), requires no response.

**18.** *Cf. Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 198–99, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999)(striking down a state law requiring petition circulators to wear a name badge, which "compels personal name identification at the precise moment when the circulator's interest in anonymity is greatest," while leaving intact a requirement that the circulator later sign an affidavit attached to the collected election signatures).

While the *McIntyre* Court also remarked that the state's interest in regulating ballot measures is "less powerful" than its interest in regulating candidate elections, *id.* at 356, 115 S.Ct. 1511, it did not state that this interest is insufficient to support disclosure requirements in the context of ballot measures.

The Court is aware of no record evidence demonstrating that Alabama voters in fact suffer from "campaign ignorance" concerning the sources and uses of money employed in connection with ballot measures. However, "the quantum of empirical evidence needed to [show the existence of the evil sought to be remedied] will vary up or down with the novelty and plausibility of the justification raised." *Nixon v. Shrink Missouri,* 120 S.Ct. at 906. The *Buckley* Court found the existence of campaign ignorance sufficiently self-evident that it required no empirical evidence showing voters' ignorance of the sources and uses of campaign money. *See* 424 U.S. at 66–67, 96 S.Ct. 612. This Court similarly concludes that the existence of voter ignorance, far from being a novel and implausible state of affairs, is a universally recognized feature of the political landscape. While "a more extensive evidentiary documentation [might be required] if [the plaintiffs] had made any showing on their own to cast doubt on" the existence of voter ignorance concerning the sources and uses of funds engaged in ballot measure advocacy, *Nixon v. Shrink Missouri,* 120 S.Ct. at 908, the plaintiffs have not questioned the existence of such ignorance but only its legal sufficiency to justify the challenged portions of the FCPA.

In summary, the Court concludes that the state's informational interest in combating voter ignorance is sufficiently compelling to support ballot measure disclosure requirements.

### 2. Registration, organizational and recordkeeping requirements.

In contrast to their focus on the FCPA's disclosure requirements, the defendants have devoted no attention to identifying or establishing a governmental interest sufficiently compelling to justify the FCPA's challenged registration, organizational and recordkeeping requirements. While an interest in detecting violations of contribution restrictions may constitute a compelling reason for such requirements, *Buckley v. Valeo,* 424 U.S. at 67–68, 96 S.Ct. 612, the FCPA imposes no restrictions on contributions, and the defendants concede that this interest has no application to the present case. (Doc. 58 at 10). Similarly, while an interest in "eliminating from the political process the corrosive effect of political 'war chests' amassed with the aid of the legal advantages given to corporations" may be a compelling reason for such requirements, *Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 658, 666, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990), the defendants have advanced no such justification in this case. Nor, for the reasons stated above, is the state's alleged interest in combating corruption a compelling interest in this context.

It is unnecessary to determine whether the defendants' sole remaining articulated interest—the informational one of curbing voter ignorance—can even theoretically be a compelling one for purposes of justifying registration, organizational and recordkeeping requirements because, as discussed below, the means selected by the Alabama Legislature are not narrowly tailored to advance this interest.

### D. Narrowly Tailored Means.

█ To be narrowly tailored, the means selected must bear a sufficiently close relation to the governmental interest advanced and must not unnecessarily infringe on First Amendment rights. *See, e.g., Federal Election Commission v. Massachusetts Citizens for Life,* 479 U.S. at 265 ("Where at all possible, government must curtail speech only to the degree necessary to meet the particular problem at hand, and must avoid infringing on

speech that does not pose the danger that has prompted regulation."); *Austin v. Michigan Chamber of Commerce*, 494 U.S. at 660, 110 S.Ct. 1391 (an election finance restriction applicable to corporations was narrowly tailored where "precisely targeted" to advance the governmental interest "while also allowing corporations to express their political views"); *Buckley v. Valeo*, 424 U.S. at 68, 81, 96 S.Ct. 612 (upholding a disclosure requirement "narrowly limited to those situations where the information sought has a substantial connection with the governmental interests sought to be advanced" and represented "the least restrictive means of curbing the evils . . . Congress found to exist").

### 1. Registration, organizational and recordkeeping requirements.

■■■ FECA prohibits corporations from using treasury funds to engage in express advocacy but allows a corporation to establish a separate, segregated fund with which to engage in express advocacy. 2 U.S.C. § 441b(a), (b)(2). Such a fund constitutes a political committee, *id.* § 431(4)(B), and is therefore subject to all the election finance restrictions applicable to political committees, including registration, organizational and recordkeeping requirements. Such a fund also is prohibited from soliciting contributions from anyone other than, with limited exceptions, shareholders or members of the establishing corporation. *Id.* § 441b(b)(4).

In *Federal Election Commission v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986), the Supreme Court ruled these restrictions unconstitutional as applied to a non-commercial, non-stock corporation be-

cause such entities do not raise the concerns of corporate corruption and involuntary diversion of shareholder wealth on which the government relied to justify the restrictions. *Id.* at 263–64, 107 S.Ct. 616. Because the plaintiff's major purpose was not to nominate or elect a candidate, the restrictions could not be justified on the alternate ground that the plaintiff was in fact a political committee. *Id.* at 252 & n. 6, 107 S.Ct. 616.

Finally, the restrictions could not be justified as necessary to prevent "massive undisclosed political spending by similar entities, and . . . their use as conduits for undisclosed spending by business corporations and unions," because FECA requires certain disclosures by organizations that are neither political committees nor corporations. Thus, "[t]he state interest in disclosure can be made in a manner less restrictive than imposing the full panoply of regulations that accompany status as a political committee under the Act." 479 U.S. at 262, 107 S.Ct. 616.

*Massachusetts Citizens* thus appears to establish that registration, organizational and recordkeeping requirements, as applied to organizations whose major purpose is not election activity, are not narrowly tailored to meet the government's informational interest because the "less restrictive" means of a disclosure requirement will satisfactorily advance that interest. *See also* 479 U.S. at 266, 107 S.Ct. 616 (O'Connor, J., concurring in part and concurring in the judgment)(FECA's organizational requirements "do not further the government's informational interest in campaign disclosure"). As discussed in the accompanying notes, the FCPA's registration,[19] organizational[20] and record-

---

19. Both statutes require political committees to promptly file a statement of organization, with the FCPA requiring considerably more information than FECA. Both statutes require prompt reporting of material changes in the information provided, and both preclude a registered political committee from dissolving without filing a statement reflecting that it

will no longer meet the definition of a political committee. *Compare* 2 U.S.C. § 433 *with* Ala.Code § 17–22A–5.

20. Both statutes require political committees to have a treasurer, to maintain a bank account into which all contributions must be deposited and from which all expenditures

keeping[21] requirements are at least as onerous as those of FECA and therefore are no more narrowly tailored.

The defendants do not question any of the foregoing. Instead, they argue that CCA may avoid these unconstitutionally burdensome requirements by the simple expedient of establishing a separate political committee. Because this tactic would obviate CCA itself receiving contributions or making expenditures for express advocacy, CCA would not engage in activity triggering the FCPA's registration, organizational and recordkeeping requirements. (Doc. 58 at 16–17).

The defendants offer no authority for the proposition that the state may enforce unconstitutional restrictions on speech against an organization simply because the organization could have avoided them by ceasing to speak altogether and allowing another entity to speak instead. Certainly an organization is free to establish a political committee and to speak indirectly rather than on its own, but the defendants have not shown that it can be forced to do so in order to escape unconstitutional restrictions on its own speech.[22]

At any rate, requiring an organization to create a separate political committee to avoid the burdens of registration, organizational changes and recordkeeping requirements itself burdens speech. The organization cannot contribute at will to the political committee for express advocacy purposes, because once it contributes over $1,000 in a year, it again becomes a political committee and subject to all of the Act's requirements. *Cf. Federal Election Commission v. Massachusetts Citizens for Life*, 479 U.S. at 252, 107 S.Ct. 616 (requiring a corporation to engage in express advocacy only through a separate segregated fund, and prohibiting the corporation from using its own general funds, "[w]hile not an absolute restriction on speech, ... is a substantial one"). Because the defendants' proposed solution itself burdens speech, they must demonstrate that it is narrowly tailored to further the state's compelling informational interest. This they cannot do, because their solution continues to impose burdensome requirements on an organization desiring to expend over $1,000 a year on express advocacy.[23]

---

must be drawn (other than petty cash disbursements no greater than $100), and to avoid commingling committee funds with those of individuals. FECA additionally requires the forwarding of contributions to the treasurer within ten to thirty days of receipt. *Compare* 2 U.S.C. § 432(a), (b), (h) *with* Ala. Code §§ 17–22A–3(a)(b), –6.

**21.** Both statutes require the treasurer to keep an account of all contributions made to or for the committee and the identification of every person to whom an expenditure is made, along with the date and amount, with no threshold dollar amount as to either contributions or expenditures. Both statutes require the treasurer to maintain a receipt or other written evidence of every expenditure of over $100 (FCPA) or $200 (FECA), and both require the treasurer to preserve all required records for two years (FCPA) or three years (FECA). *Compare* 2 U.S.C. § 432(c)(1), (5), (d) *with* Ala.Code § 17–22A–3(c), (d). The FCPA also requires the treasurer to keep receipts or similar evidence of each expenditure to any person, regardless how small, if the aggregate amount paid the person exceeds $100 in a calendar year, Ala.Code § 17–22A–

3(d), a requirement that would appear to necessitate keeping evidence of every single expenditure for at least a calendar year.

**22.** In *Austin v. Michigan Chamber of Commerce*, the Court upheld a state statute modeled after Section 441b of FECA, requiring corporations to establish a "segregated fund" in order to make independent expenditures in connection with any state candidate election. 494 U.S. at 655,56, 668–69, 110 S.Ct. 1391. While subject to the obligations applicable to political committees, the segregated fund does not appear to have been a separate entity. *See also Federal Election Commission v. Massachusetts Citizens for Life*, 479 U.S. at 255 n. 8 (distinguishing the segregated fund of Section 441b from a political committee).

**23.** The defendants appear to assume that, once having established a political committee, the organization will never again expend over $1,000 a year for express advocacy. However, even if all contributions for express advocacy previously made to the organization thereafter went directly to the political committee, the organization could continue to

In summary, the Court concludes that the FCPA's registration, organizational and recordkeeping requirements are unconstitutional as applied to organizations whose major purpose is not to engage in election activity.

## 2. Disclosure requirements.

The plaintiffs identify four reasons why the FCPA's disclosure requirements are not narrowly tailored to serve the government's compelling informational interest: (1) the FCPA requires disclosure of all contributions to and expenditures by a reporting organization, not only those made for the purpose of express advocacy; (2) even if limited to express advocacy, the disclosure requirements are vague and overbroad with respect to disclosure of contributions because reporting organizations cannot distinguish contributions made for the purpose of express advocacy from those made for other purposes; (3) the disclosure requirements do not satisfy *Massachusetts Citizens;* and (4) forced disclosure of contributors violates the free association rights of CCA and of its contributors.

## a. Disclosure of contributions and expenditures made for issue advocacy.

To avoid problems of vagueness and overbreadth, the Supreme Court in *Buckley v. Valeo* construed FECA to require disclosure, by persons other than political committees and candidates, only of expenditures "used for communications that expressly advocate" a particular election result. 424 U.S. at 79–80, 96 S.Ct. 612. A statute that requires broader disclosure from one whose major purpose is not the achievement of an election result may therefore run afoul of *Buckley.*

The FCPA does not explicitly restrict the scope of required disclosures to those contributions received, and expenditures made, for express advocacy purposes. Instead, it requires the reporting organiza-

tion to state the total amount of contributions received and expenditures made and to identify persons making contributions or receiving expenditures over a threshold amount. Ala.Code § 17–22A–8. The FCPA therefore ties the scope of required disclosures to the scope of contributions and expenditures, words defined by the Act as something received or made "for the purpose of influencing an election." *Id.* § 17–22A–2(a)(2)a,—2(a)(4)a. The parties have identified, and the Court has unearthed, no Alabama judicial decision refining these definitions or the scope of the required disclosures.

 "[A] state statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts ...." *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 216, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975). The Court concludes that the FCPA's definition of contributions and expenditures is readily subject to such a narrowing construction. FECA, like the FCPA, defines contributions and expenditures in terms of things given or received "for the purpose of ... influencing" an election. 424 U.S. at 145, 147, 96 S.Ct. 612. The Supreme Court in *Buckley* detected vagueness and overbreadth problems with this language, as it was capable of "encompassing both issue discussion and advocacy of a political result." 424 U.S. at 77–80, 96 S.Ct. 612. The *Buckley* Court resolved these potential constitutional implications with respect to expenditures by restricting the phrase to express advocacy. *Id.* at 79–80, 96 S.Ct. 612; *see also Federal Election Commission v. Massachusetts Citizens for Life,* 479 U.S. at 249, 107 S.Ct. 616 (extending this construction to expenditures under another section of FECA).

As noted, the FCPA's "for the purpose of influencing" language is identical to that contained in FECA. A comparison of the

fund express advocacy out of its own coffers; there is no legal or logical requirement that an organization expend no more on express advocacy than it receives in contributions for that purpose.

two statutes makes plain that this is not just coincidence but that the Alabama Legislature borrowed heavily from FECA in crafting the FCPA. Also as noted, the Supreme Court in *Buckley*, recognizing its duty to "avoid the shoals of vagueness" and to ensure that FECA's disclosure provisions were "not impermissibly broad," construed "for the purpose of influencing" as restricted to express advocacy. 424 U.S. at 78, 79–80, 96 S.Ct. 612. The identical language in the FCPA is as readily susceptible to this construction as it was in *Buckley*, especially given that the Alabama courts " 'will not invalidate a statute on constitutional grounds if by reasonable construction it can be given a field of operation within constitutionally imposed limitations.' " *City of Birmingham v. City of Vestavia Hills*, 654 So.2d 532, 535 (Ala.1995)(quoting *Ex parte Huguley Water System*, 282 Ala. 633, 213 So.2d 799, 805 (1968)).

Other courts have held similarly. For example, in *Virginia Society for Human Life, Inc. v. Caldwell*, 256 Va. 151, 500 S.E.2d 814 (1998), the Court held that, in light of the legislature's presumed awareness of *Buckley* when enacting Virginia's election law and of a state attorney general's opinion when amending it, the phrase "for the purpose of influencing the outcome of an election" extends only to express advocacy. *Id.* at 814; *accord Brownsburg Area Patrons Affecting Change v. Baldwin*, 714 N.E.2d 135, 140 (Ind.1999); *Bang v. Chase*, 442 F.Supp. 758, 769 (D.Minn.1977)(relying on a state ethical practices board's construction in light of *Buckley*), *judgment aff'd*, 436 U.S. 941, 98 S.Ct. 2840, 56 L.Ed.2d 782 (1978); *see also Osterberg v. Peca*, 12 S.W.3d 31, 51 (Tex.), *cert. denied,* —— U.S. ——, 120 S.Ct. 2690, 147 L.Ed.2d 962 (2000)(in light of *Buckley*, "in connection with a campaign for elective office" construed as limited to express advocacy); *State v. Proto*, 203 Conn. 682, 526 A.2d 1297, 1306 (1987)(leg-islature intended to incorporate into its definitions of contributions and expenditures the distinctions enunciated in *Buckley*); *Parcell v. Kansas*, 468 F.Supp. 1274, 1280 (D.Kan.1979)(contributions and expenditures, undefined by state statute, would be restricted to express advocacy in light of *Buckley*), *aff'd*, 639 F.2d 628 (10th Cir.1980).

In Alabama as in Virginia and elsewhere, the legislature is presumed to be aware of the language of relevant federal statutes and of the United States Supreme Court's analysis of relevant issues. *Siegelman v. Chase Manhattan Bank*, 575 So.2d 1041, 1050 (Ala.1991). More precisely, "[t]he rule is that the borrowed [federal] statute is presumed to come with its authoritative interpretation." *State ex rel. Wadsworth v. Southern Surety Co.*, 221 Ala. 113, 127 So. 805, 810 (1930).

In summary, because the FCPA readily supports—indeed, virtually compels—a construction by the Alabama courts that confines the scope of its disclosure requirements to contributions and expenditures for the purpose of express advocacy, it is not facially invalid.

**b. Identifying contributions made for the purpose of express advocacy.**

The plaintiffs next argue that, even if the disclosure obligations imposed by the FCPA are limited to express advocacy, as a practical matter the law is still vague and overbroad with respect to the disclosure of contributions, because a reporting organization cannot be sure which contributions it receives were made by the contributor for the purpose of financing express advocacy campaigns, effectively requiring the organization to disclose all contributions or risk violating the disclosure requirement. (Doc. 54 at 36–39).[24]

The plaintiffs provide examples of assertedly ambiguous contributions, such as those made in response to a solicitation letter referencing both issue advocacy and

---

**24.** The plaintiffs make no similar argument with respect to expenditures, which CCA, as the expending organization, obviously can correctly categorize.

express advocacy by the reporting organization. They do not, however, provide any authority for the proposition that a disclosure requirement is unconstitutionally vague or overbroad unless it includes minute guidelines on how to distinguish contributions made for the purpose of express advocacy from those made for other purposes.

FECA, as amended, requires a person other than a candidate or political committee to file disclosure statements if, in a calendar year, it makes over $250 in independent expenditures, defined as express advocacy not coordinated with any candidate or representative. 2 U.S.C. §§ 431(17), 434(c). The reporting organization must disclose its independent expenditures over a threshold amount and must also disclose "each person who made a contribution in excess of $200 ... for the purpose of furthering an independent expenditure," that is, for express advocacy. *Id.* § 434(c)(2)(C). In holding that a non-commercial, non-stock corporation whose major purpose is not to nominate or elect a candidate cannot be regulated as extensively as a political committee, the Supreme Court in *Massachusetts Citizens* noted that such an entity could appropriately be subjected to the lesser requirements of Section 434(c); the Court apparently was untroubled by any possibility that persons subject to Section 434(c) might have difficulty in determining whether particular contributions were or were not made for the purpose of furthering express advocacy. 479 U.S. at 262, 107 S.Ct. 616.

The Supreme Court's lack of concern with any residual ambiguity is consonant with its teachings concerning the scope of the vagueness and overbreadth doctrines. In *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), the Court upheld an Oklahoma statute that regulated the political speech and conduct of government employees on pain of criminal sanction, against both vagueness and overbreadth challenges. With respect to vagueness, the Court observed:

> Words inevitably contain germs of uncertainty and, as with the Hatch Act, there may be disputes over the meaning of such terms in § 818 as "partisan," or "take part in," or "affairs of" political parties. But what was said in Letters Carriers ... is applicable here: "there are limitations in the English language with respect to being both specific and manageably brief, and it seems to us that although the prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest."

413 U.S. at 608, 93 S.Ct. 2908 (quoting *United States Civil Service Commission v. National Association of Letter Carriers, AFL–CIO*, 413 U.S. 548, 578–79, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973)). Any lingering uncertainty in assessing whether a particular contribution was given the reporting organization for the purpose of funding express advocacy is a consequence of the inherent imprecision of manageably brief language and does not rise to constitutional proportions. With respect to overbreadth, the *Broadrick* Court noted that substantial, and not merely technical, overbreadth is required before a statute restricting free expression may be voided:

> It may be that such restrictions [on displaying political buttons and bumper stickers] are impermissible and that § 818 may be susceptible of some other improper applications. But, as presently construed, we do not believe that § 818 must be discarded in toto because some persons' arguably protected conduct may or may not be caught or chilled by the statute. Section 818 is not substantially overbroad and is not, therefore, unconstitutional on its face.

413 U.S. at 618, 93 S.Ct. 2908. The limited grey area identified by the plaintiffs does not reflect a substantial overbreadth prob-

lem. Even if it did, the plaintiffs have not, and cannot plausibly, argue that the disclosure requirement is not readily susceptible of limiting construction in the state courts.[25]

### c. *Massachusetts Citizens.*

The plaintiffs argue that *Massachusetts Citizens* dooms the FCPA's disclosure requirements as they apply to organizations whose major purpose is not campaign activity just as surely as it does the Act's registration, organizational and record-keeping requirements. The balancing of interest and burden, however, is far different in the former context, sufficiently so that the FCPA's disclosure requirements survive scrutiny under *Massachusetts Citizens.*

At the outset, only four justices in *Massachusetts Citizens* viewed the disclosure requirements applicable to political committees as contributing to the burden on the plaintiff's exercise of free speech rights. 479 U.S. at 254–55, 107 S.Ct. 616. Justice O'Connor authored a brief concurrence to clarify that these disclosure requirements—even as applied to organizations whose major purpose is not campaign activity—do not burden free speech and are in any event narrowly tailored to serve a compelling state informational interest. *Id.* at 265–66, 107 S.Ct. 616 (O'Connor, J., concurring in part and concurring in the judgment); *see also Austin v. Michigan*

*Chamber of Commerce,* 494 U.S. at 657, 110 S.Ct. 1391 (recognizing that the holding in *Massachusetts Citizens* is restricted to "certain organizational and financial hurdles" erected by FECA).

Moreover, even the four justices who believed that "[d]etailed ... disclosure obligations" played a role in discouraging free speech (along with Justice O'Connor, who joined this portion of the opinion) recognized that the government could appropriately uphold its informational interest through the more limited disclosures required of organizations other than political committees by Section 434(c). 479 U.S. at 254, 262, 107 S.Ct. 616. "These reporting obligations [of Section 434(c) ] provide precisely the information necessary to monitor [the plaintiff's] independent spending activities and its receipt of contributions," so that "[t]he state interest in disclosure therefore can be made in a manner less restrictive than imposing the full panoply of regulations that accompany status as a political committee under the Act." *Id.* at 262, 107 S.Ct. 616.[26]

The FCPA's disclosure requirements, which are substantially less extensive than those applicable to political committees under FECA,[27] compare favorably with those applicable to organizations other than political committees under Section 434(c) and approved by the *Massachusetts Citizens* Court. FECA requires such organizations

**25.** While it does not affect the analysis or result, the Court doubts that the uncertainty is truly as great as the plaintiffs maintain. Contributions earmarked for express advocacy, submitted in response to a solicitation campaign directed to express advocacy, or patently intended for such usage (such as the hypothetical contributions from Mississippi gambling interests in footnote 16) presumably are subject to disclosure, while annual contributions and others not indicating a desire for use in express advocacy presumably are not.

**26.** Indeed, in discussing *Massachusetts Citizens*, the plaintiffs themselves concede that "an independent expenditure report [under Section 434(c) ] would be directly related to the state's 'disclosure' interest" and that "even groups who are not committees can be

validly required to report their independent express advocacy expenditures [under Section 434(c) ]." (Doc. 54 at 42 n. 8).

**27.** FECA requires reporting considerably more frequently than the FCPA. *Compare* 2 U.S.C. § 434(a)(4), (8), (9) *with* Ala.Code § 17–22A–8(a), (b). FECA also requires more detailed information concerning contributors and recipients, especially individuals, than does the FCPA. *Compare* 2 U.S.C. § 431(13) *with* Ala.Code § 17–22A–8(c)(2), (7), (8). While the FCPA requires a statement of total contributions and total expenditures, FECA requires a statement of total contributions and total expenditures in each of several categories. *Compare* 2 U.S.C. § 434(b)(2), (4) *with* Ala.Code § 17–22A–8(c)(3), (5), (6), (9).

to file reports identifying those persons making contributions aggregating in excess of $200 in a calendar year, along with the date and amount of each contribution by each such individual and similarly identifying those persons receiving expenditures aggregating in excess of $200 in a calendar year, along with the date, amount and purpose of each expenditure to each such person and the election to which it applies. The FCPA requires similar disclosures, but carries a $100 annual threshold. As set out in the accompanying note, FECA requires more detailed information concerning each identified contributor and recipient and requires more frequent reports. Moreover, the FCPA requires disclosures only from groups that expend over $1,000 on express advocacy in a calendar year, while FECA requires such disclosures from groups expending over $250 in a year. *Compare* 2 U.S.C. § 434(c) *with* Ala.Code § 17–22A–8(c).

The only information required by the FCPA that is not required by Section 434(c) appears to be a statement of cash on hand, total contributions and total expenditures, and information concerning outstanding and extinguished obligations. Information concerning beginning cash, total contributions and total expenditures for express advocacy directly further the state's informational interests, and the plaintiffs do not suggest that this information is burdensome to provide. Information concerning outstanding and extinguished obligations concerning express advocacy bears a less obvious relation to the government's informational interest, but again the plaintiffs identify no burden imposed by this requirement.

While the FCPA's disclosure threshold is $100 as opposed to FECA's $200, the distinction is not constitutionally significant. The Supreme Court in *Buckley v.*

*Valeo* upheld the disclosure requirements in the predecessor to Section 434(c) even though the threshold was then $100. 424 U.S. at 157, 160, 96 S.Ct. 612. Although *Buckley* was decided in 1976, it did not "set a minimum constitutional threshold for contribution limits," whether "with or without adjustment for inflation." *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 120 S.Ct. 897, 901, 909, 145 L.Ed.2d 886 (2000); *see also Vote Choice, Inc. v. DiStefano*, 4 F.3d 26, 33 (1st Cir. 1993)(state law requiring political committees to disclose every contribution and its contributor, regardless of amount, bears a substantial relation to a compelling governmental interest).

The Supreme Court in *Buckley* recognized "that disclosure requirements—certainly in most applications—appear to be the least restrictive means of curbing the evi[l] of campaign ignorance" and found the disclosure requirements of the predecessor to Section 434(c) to be "a reasonable and minimally restrictive method of furthering First Amendment values by exposing the basic processes of our federal election system to public view." 424 U.S. at 68, 82, 96 S.Ct. 612. The same may appropriately be said of the FCPA's disclosure requirements, even as applied to organizations whose major purpose is not to achieve a particular election result. As in *Buckley*, those provisions withstand the plaintiffs' First Amendment challenge.

**d. Compelled disclosure and free association.**

Relying principally on *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), the plaintiffs next argue that the FCPA's disclosure requirements cannot constitutionally be applied to CCA because of its interference with the associational rights of CCA and its contributors. (Doc. 54 at 44–49).[28]

---

**28.** CCA has personal standing to assert this claim because whether it must disclose its contributors depends on whether it elects to engage in express advocacy, forcing CCA to choose between its free speech rights and the

associational rights of itself and its contributors. Were such disclosures required of CCA without regard to its exercise of free speech rights, it still would have standing to assert the associational rights of its contributors.

The Supreme Court in *NAACP v. Alabama* recognized that "compelled disclosures of affiliation with groups engaged in advocacy may constitute [an] effective ... restraint on freedom of association .... Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *Id.* at 462, 78 S.Ct. 1163. The Court then staked out a field within which compelled disclosure may run afoul of the First Amendment.

The NAACP made an "uncontroverted showing" that previous disclosures of membership lists "had exposed those members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." 357 U.S. at 462, 78 S.Ct. 1163. This history made it likely that the compelled disclosure of membership lists sought by the state would induce existing members to withdraw and potential members to refrain from joining due to "fear of exposure of their beliefs shown through their associations and of the consequences of this exposure." *Id.* at 463, 78 S.Ct. 1163. This effect on membership, in turn, would likely adversely affect the organization's group effort to advocate its causes. *Id.* at 462–63, 78 S.Ct. 1163. Finally, the Court found that, because the means of compelled disclosure did not have a "substantial bearing" on the state's articulated need, the state had "fallen short of showing a controlling justification" for compelling disclosure. *Id.* at 463–66, 78 S.Ct. 1163.

The reach of *NAACP v. Alabama* extends to election finance laws. Among the arguments addressed by the Court in *Buckley v. Valeo* was that FECA's disclosure and reporting requirements could not be constitutionally applied to minor parties and independents. The Court recognized that "[t]here could well be a case, similar to those before the Court in [*NAACP v.*]

Alabama and Bates [v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960) ], when the threat to the exercise of First Amendment rights is so serious and the state interest furthered by disclosure so insubstantial that the Act's requirements cannot be constitutionally applied." 424 U.S. at 71, 96 S.Ct. 612.

To satisfy *NAACP v. Alabama*, "[t]he evidence offered must show only a *reasonable probability* that the compelled disclosure of a party's contributors' names will subject them to *threats, harassment, or reprisals* from either government officials or private parties." *Buckley v. Valeo*, 424 U.S. at 74, 96 S.Ct. 612 (emphasis added). This showing may come from such sources as specific evidence of past or present harassment of members or of the organization, a pattern of threats, specific manifestations of public hostility, or conduct visited on organizations holding similar views. *Id.; accord Brown v. Socialist Workers '74 Campaign Committee*, 459 U.S. 87, 93–94, 103 S.Ct. 416, 74 L.Ed.2d 250 (1982).

The plaintiffs have not demonstrated a "reasonable probability," or any probability at all, that CCA contributors will be subjected to "threats, harassment or reprisals" should their identity become known. While the plaintiffs have offered the declarations of nine contributors, these declarations say nothing more than that, if CCA is deemed a political committee, the declarants "would no longer make contributions to [CCA] because of the requirement ... that political committees must disclose the names and cities of residence of those contributors who make contributions of more than $100." (Doc. 54, Exhibits O–T).[29] No declarant states or suggests that his decision to stop making contributions is based on a fear that he will be subjected to "threats, harassment, or reprisals" if his identity becomes known. Nor have the plaintiffs shown a "reasonable probability"

---

*See NAACP v. Alabama*, 357 U.S. at 459–60, 78 S.Ct. 1163.

**29.** One contributor says only that he would "consider" no longer making contributions. (Plaintiffs' Exhibit N).

that such a subjective fear would be realized.

Instead, the plaintiffs insist that neither a fear of reprisal nor a reasonable probability of its occurrence is necessary, but only "a chilling effect and a severe negative impact on CCA's rights of free speech and association." (Doc. 54 at 46). The Supreme Court, however, has already recognized that "public disclosure of contributions . . . will deter some individuals who otherwise might contribute," *Buckley v. Valeo*, 424 U.S. at 68, 96 S.Ct. 612, but has determined that "this is a burden that is justified by substantial Government interests." *Federal Election Commission v. Massachusetts Citizens*, 479 U.S. at 254 n. 7. The unadorned fact that some persons will be discouraged from making contributions is simply insufficient to outweigh the governmental interest in disclosure. *See, e.g., Buckley v. Valeo*, 424 U.S. at 71–72 & 72 n. 88, 96 S.Ct. 612 (testimony that several potential contributors demurred "because of the possibility of disclosure," without "stronger evidence of threats or harassment," held insufficient to satisfy *NAACP v. Alabama* ).

The plaintiffs mistakenly rely on *Local 1814, International Longshoremen's Association, AFL–CIO v. Waterfront Commission*, 667 F.2d 267 (2nd Cir.1981), for the proposition that no reasonable probability of reprisals need be shown to satisfy *NAACP v. Alabama*. In *Local 1814*, the defendant sought to enforce a subpoena requiring disclosure of longshoremen who had recently authorized payroll deductions to the local's political action and education fund. *Id.* at 269. Consistent with *Buckley*, the Court found that the lack of historical harassment of contributors was not fatal to the plaintiffs' case, because the defendant exerted "control over the professional destiny of" the contributors, including the power to remove them from the longshoremen's register, thus raising the specter of retaliation. *Id.* at 272. *Local 1814* thus plainly required a reasonable probability of threats, harassment or reprisals as a predicate to barring compelled disclosure.

In summary, the government's interest in disclosure may be overridden when there exists a reasonable probability the organization's contributors will be subject to threats, harassment or reprisals and will sever or restrict relations with the organization out of fear this reasonable probability will be realized. However, the governmental interest in disclosure is not overridden when, as here, the organization asserts merely that contributions will drop off if disclosure is required.

## E. Status as a Political Committee.

██ As noted, the FCPA deems one anticipating or actually receiving contributions or making expenditures for express advocacy to be a political committee. Ala. Code § 17–22A–2(10). The Court has concluded above that the registration, organizational and recordkeeping requirements imposed by the FCPA on political committees cannot constitutionally be applied to CCA, but that the Act's disclosure requirements may. The plaintiffs argue that, independent of any affirmative obligations thrust upon CCA by becoming a political committee, CCA is discouraged from engaging in speech that would trigger political committee status, owing to the adverse response that certain groups would have to CCA should it be deemed a political committee. They identify three such groups: (1) churches that have previously distributed CCA voter guides to parishioners; (2) husband and wife contributors who have previously contributed jointly over $1,000 to CCA; and (3) contributors who do not contribute to political committees as a matter of personal choice. (Doc. 54 at 47–49).

In *Meese v. Keene*, 481 U.S. 465, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987), the plaintiff state legislator alleged that he desired to exhibit certain Canadian films on issues such as acid rain but that he refrained from doing so because a federal statute deemed the films "political propaganda," which label would reduce his

chances for re-election and harm his reputation in the community. *Id.* at 473–74, 107 S.Ct. 1862. The Court concluded that the term "political propaganda," while capable of construction in the popular mind as a dismissive, derogatory phrase connoting slanted, misleading speech, also carries a broader, neutral meaning both in popular usage and in the statute. *Id.* at 477–78, 107 S.Ct. 1862. Because the Court's "duty [is] to construe legislation as it is written, not as it might be read by a layman, or as it might be understood by someone who has not even read it," the Court utilized the neutral meaning, causing "the constitutional concerns voiced by the District Court [to] completely disappear." *Id.* at 485, 107 S.Ct. 1862. Given this neutral meaning, the "political propaganda" label "places no burden on protected expression." *Id.* at 480, 107 S.Ct. 1862. The absence of such a burden obviated discussion of whether the government had selected means narrowly tailored to further a compelling government interest. *See id.* at 490–94, 107 S.Ct. 1862 (Blackmun, J., dissenting).

In light of *Meese v. Keene*, the label that the legislature attaches to speech or a speaker does not burden speech for purposes of First Amendment analysis unless, at a minimum, it is used as a "pejorative." 481 U.S. at 478, 107 S.Ct. 1862. That individuals or groups may respond negatively to a neutral label, and that a speaker may therefore avoid engaging in speech that will cause the label to attach, does not constitute a burden on speech, at least not one properly attributable to the government as opposed to the preferences of the audience or others.

The plaintiffs here do not contend that the term "political committee" is pejorative, and it plainly is not, either in common usage or in the FCPA.[30] Similarly, they do not contend that others will distance themselves from CCA out of revulsion, but rather from more prosaic concerns: churches will decline to distribute voter guides of a political committee for fear of losing their tax-exempt status; significant spousal contributors will not contribute to a political committee for fear of becoming a political committee themselves; and other contributors will not contribute to a political committee "as a matter of personal choice." (Doc. 54, Exhibit A at 3–5).

Even assuming that, despite *Meese v. Keene*, third party responses to a neutral term can burden speech, such responses must, in accordance with *NAACP v. Alabama* and *Buckley v. Valeo*, be based on a reasonable probability that the feared result will eventuate. The concerns expressed by the ecclesiastical and contributor declarants are not grounded in such a reasonable probability.

Five pastors have declared that their churches have previously distributed CCA voter guides but "would refuse to distribute the voter guides published by CCA if CCA was deemed a 'political committee,' out of fear that [their] church[es'] own legal status would be negatively affected, such as the threat of losing [their] 501(c)(3) tax exempt status." (Doc. 54, Exhibits I–M). The plaintiffs trace the declarants' concern to *Branch Ministries v. Rossotti*, 40 F.Supp.2d 15 (D.D.C.1999), *aff'd*, 211 F.3d 137 (D.C.Cir.2000). In *Branch Ministries*, a church's tax exemption was revoked because the church funded a full-page advertisement in the Washington Times and USA Today advocating the defeat of a presidential candidate, *id.* at 17, conduct clearly violating the Internal Revenue Code's requirements for tax-exempt status, namely, that the tax-exempt organization not "participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to)

---

**30.** *Cf. Meese v. Keene,* 481 U.S. at 484 n. 19, 107 S.Ct. 1862 (although the term "lobbying," a term used in federal statutes, carries negative connotations in popular usage, "we are not aware of any suggestion that these negative connotations violate the First Amendment").

any candidate for public office." 26 U.S.C. § 501(c)(3). At issue in this case, however, is not advocacy concerning candidates for public office but advocacy concerning ballot measures. A church may be denied tax-exempt status only if a "substantial part" of its activities include "carrying on propaganda, or otherwise attempting, to influence legislation," *id.*, and CCA admits that its desired distribution of voter guides on ballot measures is episodic and infrequent. (Doc. 54, Exhibit A at 2; Doc. 76).

Two married couples have declared that they have previously contributed over $1,000 jointly to CCA in a calendar year, but would not do so if CCA became a political committee because the FCPA requires "two or more individuals who make contributions jointly to a political committee, in excess of $1,000 in a single calendar year, . . . to register and report as a political committee." (Doc. 54, Exhibits S–T). For a husband and wife to constitute a political committee, they must constitute an "association" or "other group." Ala. Code § 17–22A–2(10). The FCPA does not define "association," but the Supreme Court has described it as " 'a body of persons united without a charter, but upon the methods and forms used by incorporated bodies for the prosecution of some common enterprise.' " *Hecht v. Malley*, 265 U.S. 144, 157, 44 S.Ct. 462, 68 L.Ed. 949 (1924) (quoting legal dictionaries); *accord Penrod Drilling Co. v. Johnson*, 414 F.2d 1217, 1222 (5th Cir.1969), *cert. denied*, 396 U.S. 1003, 90 S.Ct. 552, 24 L.Ed.2d 495 (1970). While the term "group" is less susceptible of a precise definition, its reach is restricted by the modifier "other" and "the rule of ejusdem generis, 'which ordinarily limits the meaning of general words and things to the class or enumeration employed.' " *Bly v. Auto Owners Insurance Co.*, 437 So.2d 495, 497 (Ala.1983)(quoting *Merchants' National Bank v. Hubbard*, 220 Ala. 372, 125 So. 335, 336 (1929)). The common thread uniting the specific artificial entities capable of political committee status is that they were founded to foster their goals publicly,

while the marital relationship is substantially a private one. Without analysis or citation to authority, the bald assertion that a husband and wife become a political committee by making a joint contribution does not demonstrate a reasonable probability of that result.

In summary, the FCPA's use of the neutral term "political committee," and CCA's election not to engage in express advocacy of ballot measures so as to avoid the adverse reactions of third parties to CCA becoming a political committee, does not unconstitutionally infringe on CCA's First Amendment freedoms.

### F. The Richey Plaintiffs.

The plaintiffs correctly note that there is "a First Amendment right to 'receive information and ideas,' and that freedom of speech " 'necessarily protects the right to receive.' " *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 757, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976)(quoting prior Supreme Court cases). The right to receive, however, is "derivative" of the right to speak, *Denver Area Educational Telecommunications Consortium, Inc. v. Federal Communications Commission*, 518 U.S. 727, 817, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996)(Kennedy, J., concurring in part and dissenting in part)(citing *Virginia Board of Pharmacy*), and the plaintiffs do not suggest that the Richeys can be entitled to relief unavailable to CCA.

### III. Remedy.

■ "A plaintiff moving for a preliminary injunction must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the injury to the nonmovant; and (4) that the injunction would not disserve the public interest." *Statewide Detective Agency v. Miller*, 115 F.3d 904, 905 (11th Cir.1997). The standard for a permanent injunction is identical except that

the plaintiff must show " actual success" on the merits *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987).

 The foregoing discussion demonstrates that there is no genuine issue of material fact and that the plaintiffs are entitled to judgment as a matter of law with respect to their claim that the FCPA's registration, organizational and recordkeeping requirements are unconstitutional as applied to CCA and other persons whose major purpose is not to engage in election activity. To this extent, the plaintiffs have prevailed on the merits. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). The harm to the plaintiffs from failing to enjoin those aspects of the FCPA found to be unconstitutional as applied clearly outweighs any harm to the defendants from doing so, and "[t]he public interest always is served when constitutional rights, especially free speech, are vindicated." *University Books & Videos, Inc. v. Metropolitan Dade County,* 33 F.Supp.2d 1364, 1374 (S.D.Fla. 1999). Accordingly, the plaintiffs are entitled to permanent injunctive relief. They are also entitled to a declaration that these portions of the FCPA are unconstitutional as applied.

## CONCLUSION

The plaintiffs' motion for summary judgment is **granted** to the extent it argues that the registration, organizational and recordkeeping requirements of Sections 17–22A–3, 17–22A–5 and 17–22A–6 of the Alabama Code are unconstitutional as applied to CCA and other persons whose major purpose is not to engage in election activity. In all other respects, the plaintiffs' motion for summary judgment is **denied**. The defendants' motion for summary judgment with respect to the plaintiffs' claim that the FCPA's registration, organizational and recordkeeping re-

quirements are unconstitutional as applied to CCA and other persons whose major purpose is not to engage in election activity is **denied**. In all other respects, the defendants' motion for summary judgment is **granted**. Final judgment shall be entered accordingly by separate order.

## FINAL JUDGMENT

In accordance with the separate Order entered this date, it is **ORDERED, ADJUDGED** and **DECREED** that the provisions of the Code of Alabama, Sections 17–22A–3, 17–22A–5 and 17–22A–6 are hereby declared unconstitutional as applied to any person whose major purpose is not to engage in election activity. The defendants are hereby enjoined from enforcing these provisions against the plaintiff Christian Coalition of Alabama, Inc. as long as its major purpose is not to engage in election activity. All other claims asserted by the plaintiffs are **dismissed with prejudice.**